**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KELLY GRINK, DIANE TRUMP, and STEVEN MOLNAR, individually and on behalf of the Virtua Inc., 401(k) Plan, the Virtua 403(b) Retirement Program, and all the similarly situated Participants and Beneficiaries of the Plans,<br><br>Plaintiffs,<br><br>v.<br><br>VIRTUA HEALTH, INC., BOARD OF DIRECTORS OF VIRTUA HEALTH, INC., FINANCE AND INVESTMENT COMMITTEE, VIRTUA DEFINED CONTRIBUTION PLANS RETIREMENT SUB-COMMITTEE, LINCOLN NATIONAL CORPORATION d/b/a LINCOLN FINANCIAL GROUP, LINCOLN RETIREMENT SERVICES COMPANY, LLC, and LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Defendants. | **Case No. 1:24-cv-09919-CPO-AMD** |

# FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kelly Grink, Diane Trump, and Steven Molnar ("Plaintiffs"), individually and as representatives of a class of similarly situated participants and beneficiaries of the Virtua 401(k) Retirement Program a/k/a 401(k) Savings Plan (the "Plan") and the Virtua 403(b) Retirement Program a/k/a 403(b) Savings Plan (the "Program", and together with the 401(k) Plan, the "Plans"), bring this First Amended Class Action Complaint ("FAC" or "Complaint") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3) & 409(a), against the plan sponsor, Virtua Health, Inc. ("Virtua"), the Board of Directors of Virtua Health, Inc. (the "Board"), the Finance and Investment Committee (the "Committee"), the Virtua Defined Contribution Plans ("DCP") Retirement Sub-Committee (the "Sub-Committee") (Virtua, the Board, the Committee, and the Sub-Committee are referred to collectively as the "Virtua Defendants"), as well as Defendants Lincoln National Corporation d/b/a Lincoln Financial Group ("Lincoln"), Lincoln Retirement Services Company, LLC ("Lincoln Retirement"), and Lincoln National Life Insurance Company ("Lincoln National") ("Lincoln", "Lincoln Retirement", and "Lincoln National" are referred to collectively as the "Lincoln Defendants"), for breaching their fiduciary duties in the management, operation, and administration of the Plans and their participation as parties in interest in certain of the prohibited transactions alleged herein. This FAC is being filed with Defendants' consent pursuant to Fed. R. Civ. P. 15(a)(2) (Dkt.

Nos. 37, 38), and it relates back to the date of the original pleading pursuant to Fed. R. Civ. P. 15(c).

## INTRODUCTION

1. This action is brought by current and former participants in an ERISA defined contribution retirement plan sponsored by Virtua to recover losses due to mismanagement of Virtua's 401(k) and 403(b) retirement plans, including the selection and retention of imprudent investment options and engaging in prohibited transactions with a party in interest.

2. 401(k) plans, 403(b) plans, and other defined contribution plans have become America's primary retirement system. Unlike traditional defined-benefit pension plans, which provide guaranteed payouts for life and where the employer assumes the investment risks and pays the fees and expenses of the investments, 401(k) and 403(b) plan accounts rise and fall with financial markets. Employees bear the market risk of a 401(k) or 403(b) plan's investments and must pay the fees and expenses of the investment options and plan administrative services. Thus, the proliferation of 401(k) and 403(b) plans has exposed millions of American workers to the volatility and risk of the stock market as well as high fees charged by Wall Street money managers. These retirement plans are significant to the welfare of the participants and beneficiaries in these plans.

3. The marketplace for services for defined contribution plans is established and highly competitive. Large plans, like Virtua's Plans, have the bargaining power to secure high-quality administrative and investment management services at the lowest costs available to institutions. As ERISA fiduciaries to the Plans, the Virtua Defendants are obligated to act for the exclusive benefit of participants and beneficiaries in ensuring that all Plan expenses and compensation paid to third-party service providers are reasonable. 29 U.S.C. § 1104(a)(1).

4. In this case, the Plans' fiduciaries failed to properly discharge their duties of prudence and loyalty in several basic ways.

5. *First*, the Virtua Defendants wasted participants' money by failing to appropriately select and monitor the Plans' primary fixed income investment option, the Lincoln Financial Group Stable Value Account (the "Stable Value Account"). During the Class Period,[1] as much as 23.9% of the Plans' total assets were invested in the Stable Value Account, making it the largest single investment in the Plans. Defendant Lincoln sold the Stable Value Account – a group annuity contract – so

---

[1] Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ...." 29 U.S.C. § 1113; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the "Class Period" begins on October 18, 2018 and continues through the date of judgment.

that it could reap outsized profits from a revenue sharing arrangement that paid Lincoln *55 basis points on all Plan assets invested in the Stable Value Account*. In addition, all Plan assets invested in the Stable Value Account were held in Lincoln's general account, which has allowed Lincoln to earn income based on the spread between the amount of interest it earns on its general account and the lower rate of interest – the crediting rate – it pays to Plans' participants.

6. The Virtua Defendants breached their fiduciary duties of prudence and loyalty by allowing Lincoln – a party in interest – to improperly benefit for its provision of services to the Plans by receiving unreasonable and excessive compensation from managing the Stable Value Account. Substantially similar investment products were available to the Plans throughout the Class Period from other providers that would have provided the Plans' participants with equivalent or higher returns at a substantially lower cost and without improperly benefiting a party in interest.

7. *Second*, the Plans offered and maintained higher-cost share classes of certain mutual funds in the Plans' investment menus when identical lower-cost class shares of the same mutual funds were readily available. Also, certain mutual funds offered by the Plans were available as lower-cost Collective Investment Trusts, but the Virtua Defendants failed to make this money-saving option available to the Plans and their participants. This resulted in the participants paying unnecessarily high

expense ratios that provided no added value and resulted in a loss of compounded returns. This is one of the most common and well-known examples of an imprudent investment decision.[2]

8. Specifically, an ERISA fiduciary must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring all investment options offered by the plan, including mutual fund share classes. For large defined benefit plans, particularly those with more than $1 billion in assets, a fiduciary using a prudent process will monitor the plan's investment options continuously and immediately take advantage of lower-cost share classes as they become available. The Virtua Defendants, however, failed to monitor the share classes of the Plans' mutual fund investments and saddled the Plans with excessive

[2] The need to monitor share classes is so essential that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC-registered investment advisors to ensure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf; *see also* FINRA 2016 Regulatory and Examination Priorities Letter, available at: https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf

investment expenses, thus wasting the assets of the Plans' participants and breaching their duty of prudence.

9. Plaintiffs are not second-guessing the Virtua Defendants' investment decisions with the benefit of hindsight. The information that the Virtua Defendants needed to make informed and prudent investment decisions was readily available at the time those decisions were made. The Virtua Defendants either failed to do even minimal due diligence or, worse, simply ignored readily available information. As a result, Virtua, a fiduciary, stocked the Plans with overpriced and underperforming investments, needlessly wasting participants' money to their financial detriment.

10. *Third*, the Virtua Defendants failed to monitor the Plans' recordkeeping and administrative expenses. As a result, the Plans allowed Lincoln, the Plans' recordkeeper, to receive excessive compensation for the services that Lincoln provided to the Plans.

11. Each dollar that Virtua wasted was one less dollar in participants' accounts, dollars that would have generated returns and built larger retirement savings. Those lost returns compound over time so each wasted dollar matters greatly. The U.S. Department of Labor estimates that over thirty-five years, a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[3]

---

[3] *See* U.S. Dep't of Labor, Emp. Benefits Sec. Admin., "A Look at 410(k) Plan Fees," 1-2 (September 2019), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

12. Plaintiffs, individually and as representatives of the Class defined below consisting of the Plans' participants and beneficiaries, bring this action on behalf of the Plans under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce the Virtua Defendants' liability under 29 U.S.C. §1109(a), to make good to the Plans all losses resulting from their breaches of fiduciary duties, and to restore to the Plans any lost profits. Plaintiffs also seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

13. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

14. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

15. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(l) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

16. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because it is the District in which the Plans

were administered, where at least one of the alleged breaches took place, and where at least one Defendant may be found.

## THE PLANS AND THE PARTIES

### A. The 401(k) Plan

17. The Plan, established on January 1, 2003, is a 401(k) defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34), covering substantially all employees of Virtua and affiliated employers that have adopted the Plan, who have met the age and service requirements of the Plan. The Plan was established and maintained under a written document and was amended and restated effective January 1, 2015, and January 1, 2023. Between 2018 and 2022, the Plan had between 7,612 and 11,240 participants and between 2018 and 2023, the Plan had between $485 million and $1.1 billion in assets.

18. According to the Plan Document, the purposes of the Plan are "to encourage systematic savings to meet the financial needs of Eligible Employees both during active employment and during retirement and to make available a number of investment vehicles for such savings." Virtua 401(k) Savings Plan, effective January 1, 2015, at 1-6.

19. The Summary Plan Description dated January 2014, provides that Virtua employees are eligible to participate in the Plan "as soon as administratively

practicable following your date of hire." *Id*. at 5; *see also* Summary Plan Description Aug. 2024. Unless an employee elects otherwise, Virtua employees are automatically enrolled in the Plan thirty (30) days after their date of hire. *Id*. Thereafter, employees may elect at any time to change the amount of pay they are electing to defer to the Plan. *Id*.

20. Employer matching contributions are vested after two (2) years of continuous service for employees hired before January 1, 2014, and after three (3) years of continuous service for employees hired after January 1, 2014. Summary Plan Description 2024, at 15.

**B. The 403(b) Program**

21. The Program, established on January 1, 2009, is a defined contribution, individual account, employee benefit plan under section 403(b) of the Internal Revenue Code of 1986, as amended and the regulations promulgated thereunder.

22. The Program was established by Virtua, is overseen by the Committee and Sub-Committee, and is maintained under a written document and was amended and restated effective January 1, 2023. According to the Program Document, the purpose of the Program is to provide retirement income benefits to eligible employees of Virtua and certain subsidiaries and Affiliates of Virtua.

23. The Program is maintained by Virtua and decisions are made the same way and by the same Committee and Sub-Committee that makes decisions about the 401(k) Plan.

C. **Plaintiffs**

24. Plaintiff Kelly Grink resides in Chesilhurst, New Jersey, and during the Class Period was a participant in the Program under § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Program. Plaintiff Grink suffered economic losses as a direct result of the conduct complained of herein. Throughout her participation in the Program, Plaintiff Grink paid the recordkeeping and administrative costs associated with the Program complained of herein. In addition, Plaintiff Grink invested in certain of the options offered by the Program that are the subject of this lawsuit, including the following:

- American Funds Europacific Growth R6
- American Funds Inflation Linked Bd R6
- American Funds American Balanced R6
- American Funds Washington Mutual R6
- Cohen & Steers Real Estate Securities
- Emerald Growth Institutional
- First Eagle Global R6
- Goldman Sachs Small Cap Value R6
- JP Morgan Mid Cap Growth
- MFS International Equity R6
- MainStay Winslow Large Cap Growth R6
- Metropolitan West Total Return Bd Plan
- PIMCO International Bond (USD-Hdg) Instl
- PIMCO Total Return Instl
- T. Rowe Price Mid-Cap Value
- Undiscovered Managers Fund

- Vanguard Institutional Index I
- Vanguard Mid Cap Index Institutional
- Vanguard Small Cap Index Adm
- Vanguard Total Bond Market Index
- Victory Sophus Emerging Markets R6
- Lincoln Stable Value Account

25. Plaintiff Diane Trump resides in Medford Lakes, New Jersey and during the Class Period was a participant in the Plan under § 1002(7) because she and her beneficiaries were eligible to receive benefits under the Plan. Plaintiff Trump suffered economic losses as a direct result of the conduct complained of herein. Throughout her participation in the Plan, Plaintiff Trump paid the recordkeeping and administrative costs associated with the Plan complained of herein. In addition, Plaintiff Trump invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the following:

- American Funds Europacific Growth R6
- American Funds Inflation Linked Bd R6
- American Funds Washington Mutual R6
- American Funds American Balanced R6
- BNY Mellon International Bond Fund
- Cohen & Steers Real Estate Securities
- Delaware Real Estate Securities Fund
- Dreyfus International Bond Fund
- Emerald Growth Institutional
- FLKN Templeton Foreign Fund
- First Eagle Global R6
- Goldman Sachs Small Cap Value R6
- HARBOR INTL RETIREMENT
- JPM MID CAP GROWTH
- MFS International Equity R6
- Metropolitan West Total Return Bd Plan
- Oakmark International

- PIMCO Total Return Instl
- T. Rowe Price Mid-Cap Value
- Undiscovered Managers Fund
- Victory Sophus Emerging Markets
- Vanguard 500 Index
- Vanguard 500 Index Admiral Share
- Vanguard Index
- Vanguard Mid Cap Index Institutional
- Vanguard Small Cap Index Adm
- Vanguard TTL INTL Stock Index
- Lincoln Stable Value Account

26. Plaintiff Steven Molnar resides in Williamstown, New Jersey and during the Class Period was a participant in the Plan under § 1002(7) because he and his beneficiaries were eligible to receive benefits under the Plan. Plaintiff Molnar suffered economic losses as a direct result of the conduct complained of herein. Throughout his participation in the Plan, Plaintiff Molnar paid the recordkeeping and administrative costs associated with the Plan complained of herein. In addition, Plaintiff Molnar invested in certain of the options offered by the Plan that are the subject of this lawsuit, including the Lincoln Stable Value Account and the 2025 and 2030 series of Defendants' LifeSpan Models.

27. Plaintiffs Grink, Trump, and Molnar each have both statutory and constitutional standing. First, 29 U.S.C. § 1132 (a)(l)-(3) confers standing on a plan "participant" to bring claims for ERISA violations, including claims under 29 U.S.C. § 1109 (a) for breach of fiduciary duty. Claims pursuant to 29 U.S.C. § 1109(a) are brought in a representative capacity on behalf of the Plan. Each Plaintiff was, during

the Class Period, a "participant" in the Plan or the Program as that term is defined in 29 U.S.C. § 1002(7). Each Plaintiff thus has statutory standing.

28. As to constitutional standing (also referred to as Article III standing), each Plaintiff personally suffered concrete and particularized economic injuries. During the Class Period, each Plaintiff was invested in the Stable Value Fund and was charged excessive fees to their respective individual accounts. These facts are sufficient to confer constitutional standing. Thus, Plaintiffs have standing to bring their claims individually and in a representative capacity on behalf of the Plans and the participants in the Plans.

**D. The Virtua Defendants**

29. Defendant Virtua Health, Inc. ("Virtua") is a New Jersey non-profit corporation that operates a network of hospitals, surgery centers, physician practices, and fitness centers. Virtua maintains its corporate offices and principal place of business at 303 Lippincott Drive, Marlton, New Jersey 08053.

30. Virtua is the Plan and Program Sponsor and Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i), and it is a named fiduciary under the Plans and 29 U.S.C. § 1102(a). *See*, *e.g.*, Summary Plan Description, at 3 (2014). As such, Virtua has a fiduciary responsibility to select and monitor the Plans' investment options and service providers, and to control the Plans' administrative expenses.

31. Defendant Board of Directors of Virtua Health, Inc. (the "Board") and each of its members was and is a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), throughout the Class Period, because each exercised discretionary authority to appoint and monitor the Plans' fiduciaries who had control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

32. Under ERISA, fiduciaries with the power to appoint the members of the Finance and Investment Committee (the "Committee"), such as the Board and its members, have the concomitant fiduciary duty to monitor and supervise their Committee appointees.

33. The Committee and its members are appointed, overseen, and monitored by the Board and serve as the Plans' administrator and as a named fiduciary to the Plans. The members of the Committee were and are directly responsible for making fiduciary decisions regarding the management of the Plans, including the following:

- adopting rules and regulations "deemed necessary to carry out the provisions of the Plan[s]";
- maintaining and preserving records relating to the Plans' participants and beneficiaries;

- preparing and furnishing notices and information to the Plans' participants and beneficiaries;
- preparing and filing all required reports with the U.S. Department of Labor ("DOL"), including annual reports on forms 5500;
- determining all questions of the eligibility of employees and of the rights of Participants and Beneficiaries;
- engaging professional advisers;
- monitoring the performance of various investment funds;
- appointing investment managers; and
- hiring independent public accountants.

Plan Document, at 45-46.

34. Defendant Virtua Defined Contribution Plans ("DCP") Retirement Sub-Committee ("Sub-Committee") and its members are appointed, overseen, and monitored by the Board and serve as the Plans' administrator and as a named fiduciary to the Plans. The members of the Sub-Committee were and are directly responsible for making fiduciary decisions regarding the management of the Plans.

35. The Virtua Defendants, and each of their respective members during the Class Period, were and/or are fiduciaries to the Plans under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they had and have the sole authority to amend or terminate, in whole or part, the Plans or the trusts, and have discretionary

authority to control the operation, management, and administration of the Plans, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

36. Defendant Lincoln National Corporation d/b/a Lincoln Financial Group ("Lincoln") maintains its principal place of business at 150 N. Radnor-Chester Road, Suite A305, Radnor, Pennsylvania 19087. Lincoln is the Trustee of the Plans (acting through its Lincoln Financial Group Trust Company).

37. Defendant Lincoln Retirement Services Company, LLC ("Lincoln Retirement"), an affiliate of Lincoln, maintains its principal place of business at 150 N. Radnor-Chester Road, Radnor, Pennsylvania 19087. At all times relevant to this action, Lincoln Retirement has provided recordkeeping and administrative services for the Plans.

38. Defendant Lincoln National Life Insurance Company ("Lincoln National"), an affiliate of Lincoln, maintains its principal place of business at 150 N. Radnor-Chester Road, Radnor, Pennsylvania 19087. At all times relevant to this action, Lincoln National has offered a stable value fund to the Plans' participants through its Group Annuity Contracts with the Plans. Lincoln National was at all

relevant times a fiduciary of the Plans with respect to the Group Annuity Contracts at issue here.

39. The Lincoln Defendants are parties in interest with respect to the Plans because (a) Lincoln and Lincoln National were and are fiduciaries of the Plans with respect to the Plans' assets held in the Stable Value Account, and (b) Lincoln Retirement was and is a party in interest as a provider of services to the Plans. 29 U.S.C. § 1002(14).

**THE VIRTUA DEFENDANTS' FIDUCIARY OBLIGATIONS**

40. Virtua Health is the Plan and Program administrator under 29 U.S.C. § 1002(16)(A)(i), the Plan and Program sponsor under 29 U.S.C. § 1002 (16)(B), and a "named fiduciary" under the Plan and Program instrument and 29 U.S.C. § 1002(a). As such, Virtua Health has fiduciary responsibility for the Plan's and Program's investments and administrative expenses.

41. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Virtua Defendants as Plan and Program fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Perez v. First Bankers Tr. Servs., Inc.*, No. 12-cv-4450-MAS-DEA, 2017 WL 1232527, at *72 (D.N.J. Mar. 31, 2017).

42. ERISA's statutory standard of care encompasses the traditional fiduciary duties of prudence and loyalty. *See In re Quest Diagnostics Inc. ERISA*

*Litig.*, No. 20-cv-07936-SDW-LDW, 2021 WL 1783274 (D.N.J. May 4, 2021). Under ERISA, a plan fiduciary must:

> discharge his duties … *solely* in the interest of the participants and beneficiaries and
> (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ....

29 U.S.C. § 1104 (emphasis added).

43. An ERISA fiduciary has a duty to create and follow prudent processes in selecting plan funds and managers.

44. In selecting funds for a plan, fiduciaries must "avoid unwarranted costs" by being aware of the alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig*., 74 F.3d 420, 435 (3d Cir. 1996), cert. denied, 519 U.S. 810 (1996).

45. Adherence to these duties requires analyzing statistical metrics of past risk-adjusted performance of funds and their managers and comparing them to

available alternatives to determine whether a particular fund is appropriate for addition to the plan or if superior alternative investments are available.

46. An examination of the cost and fee structure of the funds selected for the Plans shows that the Committee and Sub-Committee did not have a viable methodology for selecting funds or controlling the costs and expenses of its investment options. Modern Portfolio Theory ("MPT"), Prudent Investor Rule (Restatement (Third) Trusts) and ERISA's prudent expert standards required the Committee and Sub-Committee to have a prudent methodology for making sure participants' money was spent wisely.

47. As described below, the Committee and Sub-Committee failed to institute, follow, and apply processes that are consistent with the competence, skill, effort, and diligence that is required of a prudent fiduciary because the Committee and Sub-Committee persistently selected funds for the Plans that carried higher costs and lower returns than available alternatives.

48. 29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge their duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

49. 29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." The Lincoln Defendants are "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

50. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

51. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## FACTUAL ALLEGATIONS

52. In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34). Participants' investments are held in trust. Typically, participants direct the investment of their accounts, choosing from the lineup of available plan investment options chosen by the plan sponsor.

### A. The Virtua Defendants Imprudently Maintained the Plans' Investment in the Stable Value Account, When Other Investment Vendors Offered Superior Alternatives at Substantially Lower Cost

53. For defined-contribution retirement benefit plans, stable value investments are intended to provide participants with an option that protects their principal and is shielded from risks of loss. Throughout the Class Period, the Plans' stable value investment has been the Lincoln Stable Value Account.

54. At all relevant times, the Plans have been designed around a menu of three model portfolios based on varying levels of risk tolerance, ranging from the lowest risk "Conservative Portfolio" to the medium risk "Moderate Portfolio," and the highest level of risk "Aggressive Portfolio." Each model portfolio included an allocation of the participant's investments to the Stable Value Account, which guaranteed a high percentage of the Plans' assets being invested in Lincoln's most profitable offering in the Plans.

55. Stable value funds are not SEC-registered mutual funds. Rather, they are single company fixed annuity contracts structured as either an insurance company general account product (as is the case here) or an insurance company separate account and are solely regulated by the State Insurance Commissioner selected by the insurance company. There are alternative structures, including synthetic stable value funds, which are run by a Registered Investment Advisor ("RIA") regulated by the SEC.

56. The differences between the different types of funds – and the risks inherent in such structures – are critical from a fiduciary standpoint. The Lincoln Stable Value Fund is an insurance company general account product.

57. A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides returns over time that are (or at least should be) consistently higher than money market funds. Stable value accounts differ from both bond funds and money market funds, however, in that they seek to generate returns greater than money market funds and equivalent to short- to intermediate-term bond funds. Stable value funds can do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables stable value account providers to offer higher crediting rates (the rate of return to the plan participants) and to guarantee participants will not lose money by ensuring the fund transacts at book value.

58. Stable value accounts also "stabilize" the returns through the use of an embedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds. Single fixed annuity contracts are set by the insurance company at their discretion, which typically maximizes profit to the insurance company and minimizes returns to participants which is a fiduciary breach.

59. There are several types of stable value accounts in the 401(k) and 403(b) marketplace. For instance, large plans often offer "synthetic" stable value funds, which are the least risky, because the principal is guaranteed by multiple "wrap providers"[4] and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products (like the Stable Value Account at issue here), where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently offer the highest rates.

60. For a general account fund, the insurer's payment obligations are backed by the insurer's unrestricted general accounts. Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Thus, such funds are subject to single-entity credit risk, meaning

[4] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relies on both the value of the associated assets and the financial backing of the wrap issuer.

the insurer is the sole entity responsible for paying such funds; if the insurer fails, no other entity will satisfy the loss.[5]

61. By comparison, for a separate account fund, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer.[6]

62. Synthetic stable value funds eliminate the single entity credit risk. "A synthetic stable value fund is a diversified portfolio of fixed income securities and is insulated from interest rate volatilities through wrap contracts with insurers… Unlike general account and separate account products, however, with a synthetic stable value product, the plan participants actually own the underlying assets." *Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-CV-00048-GNS, 2019 WL 3536038, at *6 (W.D. Ky. Aug. 2, 2019). For this reason, the majority of plans that

---

[5] Courts have recognized the heightened risk of general account stable value funds, stating, "[T]he Plan does not own the assets of the fund, which are placed in the insurance company's general account. Thus, should Principal become insolvent, the Plan could only recover to the extent assets from Principal's general accounts are available—i.e., as an unsecured creditor.… The 1980s and 1990s saw several high-profile insolvencies of stable value providers." *Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-CV-00048-GNS, 2019 WL 3536038, at *6 (W.D. Ky. Aug. 2, 2019).

[6] Separate accounts eliminate some of the single entity credit risk. *See Disselkamp*, 2019 WL 3536038, at *6 (stating, "The separate account contract, as its name suggests, requires the insurer to create a segregated account to support the contract. … As with general account products, the participants do not own the funds being invested, but because the insurance company keeps the Plan's investment in a segregated account, there is some limited protection against creditors.… Namely, … the segregated account is not subject to the insurer's general creditors.")

are similar in size to Virtua's Plans use a lower risk synthetic stable value product rather than general account or separate account products.

63. The Lincoln Stable Value Account is a general account product established pursuant to a contract between Virtua Health and Lincoln and/or Lincoln National. The investment funds are deposited by Lincoln and/or Lincoln National in their general account, which enables Lincoln and/or Lincoln National to earn a "spread" representing the difference between the crediting rate that it pays to Plan participants and the returns that are earned by Lincoln and/or Lincoln National by investing their general account funds.

64. The Stable Value Account at issue in this case, however, was and is subject to the single entity credit risk of Lincoln and/or Lincoln National, the issuer of the contract. The crediting rate, set in advance by Lincoln and/or Lincoln National and reset from time to time in Lincoln's and/or Lincoln National's sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the Stable Value Account have an interest. Thus, the Virtua Defendants would have had the opportunity and duty to evaluate the prudence of maintaining this investment offering in advance, and at least on an annual basis.

65. Accordingly, this is not a case that involves the judging of the prudence of an investment with the benefit of hindsight.

66. Lincoln and Lincoln National earned outsized profits from the Stable Value Account. Under the Plans' Group Annuity Contracts, all contributions and interest become part of the general assets of the Company.

67. Lincoln and/or Lincoln National receives revenue in the amount of fifty-five (55) basis points (0.55%) on assets in the Lincoln Stable Value Account annually.

68. For example, as of December 31, 2022, $171,617,383 in Plan assets were invested in the Stable Value Account, which would have provided Lincoln with an annual fee of approximately $943,895.61.

69. Defendants Lincoln and Lincoln National additionally made spread income. The amount of spread income that Lincoln and/or Lincoln National earned on their general account can only be known to Plaintiffs through the formal discovery process.

70. The fee income above at minimum, however, assured that Lincoln and/or Lincoln National would receive no less than 55 basis points on the total assets invested in the Stable Value Account. According to the Plan's Third Restated Recordkeeping Service Agreement, which was effective in July 2017, this 55-basis point fee may be partially offset by the spread income that Lincoln and/or Lincoln National receive from investing the Stable Value Account assets, which are held in their general account. Specifically, the contract provides:

> Assets placed in the Stable Value Account are invested by Lincoln. Lincoln pays investors in this account a credited interest rate. The method of crediting interest for the Stable Value Account is based on an external index. Lincoln guarantees a minimum credited interest rate of 3.00% [as of November 16, 2017]. Lincoln attempts to invest the assets in the Stable Value Account in financial instruments that pay Lincoln more than the interest Lincoln pays out to investors and other costs incurred by Lincoln…. The larger the spread is (the lower the credited interest rate), the less income Lincoln needs from other sources, such as an asset charge, to pay for plan services.

Third Restated Recordkeeping Service Agreement (July 1, 2017), at Exhibit A (Fees provided by Investments).

71. As shown in the table below, the 55-basis point revenue-sharing payments that Lincoln received from the Stable Value Account – not including spread income earned by depositing Plan assets in its general account – was excessive:

**Table 1: Revenue Sharing Received by Lincoln**

| YEAR | ASSETS IN STABLE VALUE ACCT. AT YEAR END | INDIRECT REVENUE SHARING FROM STABLE VALUE ACCT. (55 BPS) |
|---|---|---|
| 2018 | $ 116,389,472.00 | $ 640,142.09 |
| 2019 | $ 138,873,530.00 | $ 763,804.41 |
| 2020 | $ 164,252,057.00 | $ 903,388.43 |
| 2021 | $ 172,028,443.00 | $ 946,156.44 |
| 2022 | $ 171,617,383.00 | $ 943,895.61 |

72. For just the years above, the 55-basis point revenue sharing payments total **$4,197,386.98**.

73. The Virtua Defendants imprudently selected the Stable Value Account as one of the key components of the model portfolios that serve as the Plans' Qualified Default Investment Alternative ("QDIA"). Most large 401(k) and 403(b) plans use target retirement date funds as the QDIA because such funds provide one-stop-shopping for participants looking for a simple way to invest their retirement savings in a low-cost mutual fund or CIT that will have the optimal asset balance and returns to stay ahead of inflation.

74. In a recent report to Congress by the U.S. General Accountability Office ("GAO"), it was noted that "Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) and 403(b) plan participants. TDFs allocate assets over time based on participants' targeted retirement dates."[7]

75. Prudent plan sponsors often "choose TDFs as their default investment because TDFs offer low fees, a well-diversified all-in-one portfolio, and a 'set it and forget it' option for participants."[8] The number of 401(k) plan participants offered TDFs as an investment option increased from 42 percent in 2006 to 84 percent in 2020.[9] "As of June 2023, defined contribution plans held approximately $2.8 trillion

---

[7] *See* GAO, "401(k) RETIREMENT PLANS Department of Labor Should Update Guidance on Target Date Funds," (March 2024) (available at https://www.gao.gov/assets/gao-24-105364.pdf (last visited October 10, 2024).
[8] *Id.*
[9] *Id.*

in TDF assets, according to the Investment Company Institute (ICI) and Morningstar."[10] This is a substantial percentage of the $8 trillion that was invested in 401(k) plans at the end of 2021.[11]

76. To be sure, risk levels, performance, and fees vary across TDFs – *i.e.*, some are better than others. However, it was imprudent for the Virtua Defendants to completely overlook the inclusion of a suite of TDFs as investment options for the Plans during the Class Period. And it was an even more significant fiduciary lapse for the Virtua Defendants to fail to consider a TDF as the QDIA for the Plans.

77. Rather than designating a TDF as the Plans' QDIA, the Virtua Defendants designated the "Conservative Portfolio" as the Plan's QDIA. The Conservative Portfolio would automatically funnel approximately one-third of the retirement savings of the least sophisticated Plan participants, who did not appreciate the mediocre rate of return on the Stable Value Account (which often was below the annual inflation rate) into the Stable Value Account. Even the so-called "Moderate Portfolio" and "Aggressive Portfolio" placed significant percentages of employees' retirement savings in the Stable Value Account.

---

[10] *Id*. at 1-2.

[11] At the end of 2021, 401(k) plans held approximately $8 trillion in assets, according to the most recent data available. Employee Benefits Security Administration, Department of Labor, Private Pension Plan Bulletin: Abstract of 2021 Form 5500 Annual Reports, Sept. 2023.

78. As an ERISA fiduciary, the Virtua Defendants had an obligation to monitor the fees, risks, and performance of the Lincoln Stable Value Account and to remove and/or replace it when similar stable value investment options could be obtained from numerous providers at a lower cost. *See*, *e.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected."); *Disselkamp*, 2019 WL 3536038, at *8 (denying motion to dismiss claims that the defendants imprudently selected a higher risk general account stable value fund as a result of an "alleged failure to employ a prudent methodology and comparisons with better performing SVAs…").

79. Moreover, during the Class Period, the Plans received a lower crediting rate for the Stable Value Account than other comparable plans received for less risky separate account stable value funds. The Plans continued to hold the riskier Stable Value Account even though it paid substantially lower crediting rates than safer separate account stable value options. A comparison of the rates for the Lincoln Stable Value Account to better performing separate account stable value options is set forth in the **Table 2** below:

| Time Period (Calendar Quarter) | Crediting Rates for Lincoln Stable Value Account in the Plan (%) | Crediting Rates for MassMutual Separate Account Stable Value (%) | Crediting Rates for TIAA Traditional Annuity (%) |
|---|---|---|---|
| 3Q 2018 | 3.00 | 4.68 | 4.35 |
| 4Q 2018 | 3.00 | 4.66 | 4.35 |
| 1Q 2019 | 3.00 | 4.66 | 4.35 |
| 2Q 2019 | 3.00 | 4.47 | 4.35 |
| 3Q 2019 | 3.00 | 4.41 | 4.35 |
| 4Q 2019 | 3.00 | 4.55 | 4.35 |
| 1Q 2020 | 3.00 | 4.03 | 3.90 |
| 2Q 2020 | 3.00 | 4.03 | 3.90 |
| 3Q 2020 | 3.00 | 4.03 | 3.90 |
| 4Q 2020 | 3.00 | 4.03 | 3.90 |
| 1Q 2021 | 3.00 | 4.03 | 3.90 |
| 2Q 2021 | 3.00 | 4.03 | 3.90 |
| 3Q 2021 | 3.00 | 4.03 | 3.90 |
| 4Q 2021 | 3.00 | 4.03 | 3.90 |
| 1Q 2022 | 3.00 | 4.03 | 4.25 |
| 2Q 2022 | 3.00 | 4.55 | 5.08 |
| 3Q 2022 | 3.00 | 4.47 | 5.50 |
| 4Q 2022 | 3.00 | 5.80 | 6.00 |
| 1Q 2023 | 2.75 | 5.70 | 6.25 |
| 2Q 2023 | 2.75 | 5.52 | 6.25 |
| 3Q 2023 | 2.75 | 5.34 | 6.75 |
| 4Q 2023 | 2.75 | 5.26 | 6.75 |
| 1Q 2024 | 2.75 | 4.98 | 6.00 |
| 2Q 2024 | 2.75 | 4.98 | 5.58 |

80. Because the Plan held at least $485 million in assets under management, the Virtua Defendants have had considerable leverage to bargain for higher crediting rates.

81. As the table above shows clearly, substantially higher crediting rates were readily available on the open market that would have exponentially increased the amounts to the Class members over time, with compounding.

82. A prudent fiduciary knew or should have known that Lincoln and Lincoln National or other providers of fixed annuities offer substantially identical, better-performing stable-value investments. A prudent fiduciary could have accomplished the goal of obtaining better-performing stable-value investments simply by demanding higher crediting rates from Lincoln and Lincoln National and/or by submitting requests for proposals to Lincoln and Lincoln National, and other providers of stable-value investments, as substantially higher rates were readily available.

83. By selecting a general account fixed annuity with an underperforming crediting rate, the Virtua Defendants failed to provide participants with an option that adequately protected their principal, exposing participants to unreasonable loss of value versus inflation over time.

84. In addition, or in the alternative, a prudent fiduciary knew or should have known that MassMutual and TIAA (as shown above) and others offered separate-account stable value funds that had substantially higher crediting rates than the Plans' general-account Stable Value Fund and that were less susceptible to single-entity credit risk. The existence of MassMutual's higher-performing separate-

account stable value fund also should have put a prudent fiduciary on notice that the Plans could obtain better-performing stable-value investments.

**B. The Virtua Defendants Caused the Plans' Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost/Higher Return Mutual Share Classes as Plan Investment Options**

85. A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership of the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses, and other costs.

86. Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (*i.e.*, sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical - the managers, investment styles, and stocks are not merely similar but identical. The principal difference between the share classes is that the mutual fund will charge different marketing, distribution, and service expenses depending on the class

chosen. Generally, lowest cost class shares are available to larger investors, such as 401(k) and 403(b) plans like the Plans, since institutional investors make large fund share purchases, and higher-cost share classes are typically sold to retail investors.

87. The U.S. Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

88. The Virtua Defendants had access to these low-cost institutional share classes of mutual funds, as they could easily meet the minimum investment requirements.

89. In a blatant violation of their fiduciary duty to act prudently and responsibly, instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, the Virtua Defendants instead offered higher-cost mutual fund share classes as investment options for the Plan. Thus, the Plans' fiduciaries wasted the assets of the Plans by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the Plans' menus.

90. The following are instances in which The Virtua Defendants wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plans:

91. ***First Eagle Global Fund Class I.*** The Virtua Defendants selected and maintained the First Eagle Global Fund Class I, which had an expense ratio of **0.84%**, in the Plans until March 2020, when they belatedly upgraded to the lower cost R6 version of this fund, which had been available since March 1, 2017, and had an expense ratio of **0.78%**. The Plan had more than $3.1 million invested in First Eagle Global Fund Class I as of December 31, 2018, and therefore, the Plan would have qualified for the lowest-cost R6 share class of this fund at all times during the Class Period.

92. ***Oakmark International Institutional Fund.*** The Virtua Defendants chose the Oakmark International Institutional Fund in 2020, which had an expense ratio of **0.81%**, instead of the Oakmark International R6 class, which was available as of December 15, 2020, with an expense ratio of **0.75%**. The Plan had more than $8 million invested in the Oakmark International Institutional Fund as of December 31, 2020, and continued to maintain a similar level of assets in this fund through December 31, 2022. Therefore, the Plan would have qualified for the lowest-cost share class of this fund at all times during the Class Period.

93. ***Vanguard 500 Index Admiral Class.*** The Virtua Defendants selected and retained as an investment option the Vanguard 500 Index Admiral Class, which currently has an expense ratio of **0.04%**, rather than the lower-cost Vanguard 500 Index Institutional Class, which was available to the Plan at all times during the Class Period and has an expense ratio of **0.01%**. The Plan had more than $34 million invested in the Vanguard 500 Index fund as of December 31, 2018, and more than $74 million in this fund as of December 31, 2022. Therefore, the Plan would have qualified for the lowest-cost share class at all times during the Class Period.

94. ***Vanguard Mid-Cap Index Fund Admiral.*** The Virtua Defendants selected and retained as an investment option the Vanguard Mid-Cap Index Fund Admiral Shares, which had an expense ratio of **0.05%** until April 2022, at which point they transferred the investment to the lower-cost Vanguard Mid-Cap Index Fund Institutional Shares, which had been available to the Plans at all times during the Class Period and had an expense ratio of **0.04%**. The Plan had over $5.3 million invested in the Vanguard Mid-Cap Index fund as of December 31, 2021. Therefore, the Plan would have qualified for the lowest-cost share class at all times during the Class Period.

95. ***Vanguard Small-Cap Index Fund Admiral.*** The Virtua Defendants selected and retained as an investment option the Vanguard Small-Cap Index Fund Admiral Shares, which had an expense ratio of **0.05%** until April 2022, at which

point they transferred the investment to the lower-cost Vanguard Small-Cap Index Fund Institutional Shares, which had been available to the Plans at all times during the Class Period and had an expense ratio of **0.04%**. The Plan had more than $12.8 million invested in the Vanguard Small-Cap Index Fund as of December 31, 2021. Therefore, the Plan would have qualified for the lowest-cost share class at all times during the Class Period.

96. ***Vanguard Total International Stock Index Fund Admiral.*** The Virtua Defendants selected and retained as an investment option the Vanguard Total International Stock Index Fund Admiral Shares, which had an expense ratio of **0.11%** until April 2022, at which point they transferred the investment to the lower-cost Vanguard Total International Stock Index Fund Institutional Shares, which had been available to the Plan at all times during the Class Period and had an expense ratio of **0.08%**. The Plan had over $39 million invested in the Vanguard Total International Stock Index Fund as of December 31, 2021. Therefore, the Plan would have qualified for the lowest-cost share class at all times during the Class Period.

97. The Virtua Defendants' failure to promptly investigate and unreasonable delay in replacing higher-cost share funds applies to both the Plan and Program.

98. The Virtua Defendants' repeated failures to promptly obtain the lowest-cost share class for each of the Plans' investment options is even more alarming in

light of the fact that the Virtua Defendants, through Lincoln, retained and paid an investment advisor to assist them in selecting investments for the Plans' model portfolios. Specifically, since at least 2017, Lincoln has contracted with Ibbotson to provide investment advisory services to the Plans, including providing model portfolios, pursuant to an Advisory Services Agreement on an asset-based fee of four basis points (0.04%) annually.

99. Investing the Plans' assets in higher-cost share classes has harmed the Plans' participants because it causes them to pay excess indirect fees that are not tethered to any service provided to the Plans' participants but rather are tied to the amounts invested by the Plans' participants. Because the Plans could have invested in identical mutual funds with a lower share class, the Virtua Defendants' actions were directly erosive to the Plans' growth.

100. The Virtua Defendants thus caused Plaintiffs and other participants and beneficiaries in the Plans harm not only by forcing them to pay higher fees but also by causing them to lose yield and returns as a result of those higher fees on the majority of investments offered through the Plans.

101. The erosive effect of excessive fees and the resulting lost returns also compounds over time, substantially lowering the corpus of participants' retirement investments.

102. By selecting share classes with a higher fee, the Virtua Defendants demonstrated not only a lack of fiduciary prudence but also a lack of simple basic skills when selecting investments.

103. A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plans. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[12]

104. The Plans offered and maintained higher-cost share classes when identical lower-cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments – with the same assets, investment style, and management – the Virtua Defendants chose the more expensive product.

105. The Virtua Defendants thus harmed the Plans' participants and beneficiaries by forcing them to pay higher fees and causing lost yield and returns that the participants rely on for retirement income. In doing so, the Virtua Defendants

---

[12] "OCIE's 2016 Share Class Initiative," National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at: https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-shareclass-initiative.pdf.

undermined the very purpose of the Plans, which is to provide income security for participants and beneficiaries.

### C. The Virtua Defendants Failed to Investigate the Availability of Lower Cost Collective Trusts for the 401(k) Plan

106. The following allegations concerning the availability of collective investment trusts or "CITs" pertain exclusively to the 401(k) Plan.

107. Many mutual funds offer multiple classes of shares in a single mutual fund targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no material difference between share classes other than cost—the funds hold identical investments and have the same manager.

108. CITs are akin to low-cost share classes because many, if not most, mutual fund strategies are available in a collective trust format. The investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

109. ERISA is derived from trust law. *See Tibble I*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *See Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).

110. One such area is the selection of appropriate funds for a plan. Trust law states that it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts, § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id*. (emphasis added).

111. Plan fiduciaries like the Virtua Defendants are legally bound to be continually mindful of investment options to ensure that they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan-specific shares of mutual funds.

112. Despite the advantages of collective trusts, as of December 31, 2022, the Plan did not include any collective trust versions of its investment offerings but instead offered only higher-cost mutual funds.

113. The Virtua Defendants thus breached their fiduciary duty of prudence when they failed to investigate the availability of lower-cost CIT versions of the Plan's mutual fund offerings in a timely manner.

114. Had the Virtua Defendants elected to convert the Plan's mutual fund offerings to the CIT versions of such investments, there would have been a seamless transition to the use of CITs, which were and are available for substantially all funds that are currently in the Plan's fund lineup.

115. The estimated fee savings that would have been realized by transitioning from mutual funds to CIT versions of the Plan's investment offerings would be between 20-30%.

116. A clear indication of the Virtua Defendants' lack of a prudent investment evaluation process included their failure to timely identify and select available lower-cost collective trusts. The Virtua Defendants selected and retained mutual fund versions of the Plan's mutual fund investments with significantly higher expense ratios than the CIT versions offered by the same fund families. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified these lower-cost CITs at the earliest opportunity. Here, virtually all the Plan's mutual fund offerings were available as lower-cost CITs throughout most of the Class Period.

### D. The Committee and Sub-Committee Ignored their IPS Metrics in Selecting Funds and Fund Managers

117. The IPS describes the Committee's members' decision-making guidelines. Appendix B of the IPS states that the Committee should focus on key areas for their investment selections and retentions such as "Active Evaluation

Criteria" and review and consider in selection of funds and managers whether "[m]anager tenure greater than or equal to 3 years" as well as "3 year performance greater than 50% of peers" along with "5 year performance greater than benchmark" and "… greater than 50% of peers."

118. The IPS also guides the Committee to consider 5-year and 10-year Sharpe Ratio greater than 50% of peers. Finally, the Committee's decision-making should also focus on lower "Net Expense Ratios" and whether the mutual funds' "Investment Style" was "consistent with the fund's objectives." Standard deviation should be used to investigate investment risk.

119. Evidence from the certified reporting to the U.S. Departments of Treasury and Labor (www.efast.dol.gov; Annual Return/Report of Employee Benefit Plan (Form 5500) for plan years 2009 to 2023) indicates the Committee's selections and actions over a long period of time demonstrate that they failed to follow their IPS and any prudent process in selecting investments, funds and their related managers.

120. Over 90% of the Committee's selection from 2007 to 2018 didn't conform with their IPS and over 80% from 2019 to 2022. The Committee selected these funds even though they clearly and demonstrably underperformed due to high costs, high risks and low returns in the past.

121. The fact that the Committee and Sub-Committee consistently selected funds with dismal statistical metrics in violation of common sense and their IPS guidelines demonstrates that a plan-wide imprudent process was at play.

122. The Committee's failure to act, ignorance, and or inability to follow a prudent process and their IPS metrics is best illustrated by the Committee's imprudent and inexplicable decisions surrounding the selection and retention of the Metropolitan West Total Return Bond Fund ("MetWest").

**Table 3: MetWest Bond Fund's Excessive Turnover Costs**

| Year & Turnover % | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MetWest Bond** | 426 | 467 | 470 | 405 | 255 | 291 | 313 | 303 | 255 | 160 | 160 |
| **Corporate Bond Average** | 70 | 57 | 64 | 77 | 66 | 55 | 58 | 64 | 74 | 68 | 68 |

123. For more than a decade the MetWest bond exhibited high turnover costs, at least double the bond average and often times triple and quadruple.

124. Extraordinarily, the MetWest fund manager traded at over 100% each year. High turnover comes with transaction fees that decrease investors' returns and thereby elevate their risk.

125. Nevertheless, even though the MetWest fund manager proved a lack of skill with his track record of excessive turnover costs and risk, the Committee and Sub-Committee nonetheless selected (and retained) this fund as an option for their

Plan participants causing the participants to pay extremely high turnover costs for predictably low returns.

126. ERISA prescribes that a prudent investor must minimize costs of the Plan because costs erode returns and growth. Even a small increase in costs can substantially erode returns over a long period of time, which is why it is paramount, and the law, to analyze and consider costs when selecting investment options.

127. Different investment alternatives chosen by the Plan's fiduciaries have different fees. Investment fees are daily charges against the investors' returns associated with managing and operating the funds, and they also provide compensation to third parties of a retirement plan. Because a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement, fiduciary decisions affecting fees can dramatically affect the amount of money that participants are able to save for retirement.

128. Here, the Committee and Sub-Committee consistently failed to minimize costs and signed up the Plan participants to pay excessively high turnover costs associated with MetWest's turnover, which resulted in millions of dollars of growth lost for the Plan participants.

129. In addition to extremely high turnover costs, MetWest is also a managed fund that carries fifty basis points (0.5%/year) in annual expenses for manager compensation. Additional costs are not per se a problem, but the additional active

management cost must carry a payoff over and above those additional costs when compared to an unmanaged fund.

130. However, an examination of MetWest's performance makes it clear that it did not outperform its peers under either the Committee's IPS metrics or general sound industry-standard selection criteria. To make matters worse, MetWest not only failed to outperform passively managed funds but also performed dismally in comparison with its peers.

131. Back in 2015 when MetWest was selected, analyzing its past performance revealed that from 2010 to 2014, MetWest's peers averaged returns 6.87% per year, while MetWest earned only 0.45% per year.

132. A ten-year lookback period reveals similarly poor historical performance of the MetWest fund. MetWest averaged 1.75%, while its peers averaged 5.42%.

133. The Committee and Sub-Committee nevertheless imprudently selected this fund despite the MetWest fund carrying excessively high turnover costs, substantially lower performance than its peers for years and years in violation of their IPS and sound selection and retention factors.

134. At all relevant times, the Committee and Sub-Committee could have selected any of MetWest's average performing peers and earned the participants millions of dollars of additional bond interest and growth.

135. Unfortunately, the Committee's inexplicable poor judgment in selecting MetWest is not an outlier in the Plan's portfolio. The Committee and Sub-Committee consistently selected funds with terribly high costs and poor performance due to a lack of prudent processes that would prevent these predictably poor selections.

### E. The Committee and Sub-Committee Ignored its IPS Metrics and Failed to Follow a Prudent Process with Respect to Target Date Funds ("TDF")

136. In addition to corporate/government bond funds and non-TDF mutual funds, the Committee and Sub-Committee also offered a TDF option to its Plan participants.

137. The Committee's systematic and consistently imprudent choices are also reflected in the Committee's target date fund.

138. As the TDF option, the Committee and Sub-Committee selected and offered LifeSpan Models[13] that performed 5.02% worse than the average TDF's mutual fund in 2019.[14]

139. Nevertheless, the Committee and Sub-Committee offered this TDF as an option in violation of its IPS and prudent processes and offered this grossly underperforming option as compared to the average peer to its Plan participants.

---

[13] Plaintiff Molnar's wages were allocated in this option.
[14] Lifespan 13.45% as compared to average TDF 18.47%.

140. The TDF options of the Plan were infested with selections defying common sense, prudent processes, and the Committee's IPS.

141. For example, due to the same lack of prudent processes in selecting funds and managers, the Committee and Sub-Committee selected American Funds Europacific Growth as part of the LifeSpan Models in 2021.

142. A prudent investigation before the selection/retention of this fund would have revealed the fund was not in compliance with (1) the prudent man rule of ERISA, (2) the Restatement of the Law Third Trusts (avoid unwarranted costs), and the (3) Defendants' own IPS requirements.

143. Thus, (1) adding this fund to the Virtua participants' limited menu of investment choices and inclusion (2) in the Lifespan models was reckless.

144. Based on the real-time facts and circumstances prevailing during the Committee's initial selection conduct, the geometric mean showed a loss of one hundred and fifty-one basis points each year over the earlier three years of 2020, 2019, and 2018.

145. In that same vein, the fund's performance lagged behind peers and its alpha ratio in the Foreign Large Growth Category Average was 38 basis points over the prior five years and 42 basis points over the prior 10 years (data at the time of selection conduct to add this fund).

146. Likewise, the Committee's selection also lagged behind its peers in Treynor ratio. The worse the Treynor ratio, the higher the risk of the investment.

**Table 4: 2020 Treynor Ratio for American Funds Europacific**

| ***As of 1/1/2020 (lower is worse)*** | **Treynor 1-year** | **Treynor 3-year** | **Treynor 5-year** | **Treynor 10-year** | **Relative Risk 1-year** | **Relative Risk 3-year** |
|---|---|---|---|---|---|---|
| Foreign Large Growth Average | 30.81 | 13.6 | 7.45 | 6.55 | 0.88 | 0.96 |
| American Funds Europacific Growth R5 | 25.19 | 10.27 | 6.72 | 6.46 | 1.00 | 1.01 |

147. Moreover, this fund also carried higher turnover costs that should have tipped the Committee and Sub-Committee off that this is not a prudent inclusion.

148. Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds. In that sense, they are also a measure of risks associated with the investment because these additional transactions carry additional costs. The higher the costs, the higher the performance must be to merely go even with lower cost options.

149. The American Funds Europacific Growth had significant and material turnover for a prolonged amount of time. The fund's turnover rates averaged 31.4 percent over the eleven years. This substantial turnover created transaction costs for the participants over and above the portfolio manager's compensation. This fund's

performance could not justify these additional, unnecessary costs, which the Committee and Sub-Committee should have recognized.

150. Generally, a turnover rate above 30% warrants close analysis by plan fiduciaries as it can suggest that the manager is not following a disciplined investment strategy.

**Table 5: American Funds Europacific 10-Year Turnover Rates**

| Turnover Rate (>30 is costly) | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| American Funds EuroPacific Growth | 34 | 29 | 32 | 38 | 35 | 29 | 36 | 30 | 28 | 27 | 27 |

151. Nevertheless, the Committee and Sub-Committee still selected and retained this fund in violation of its IPS due to the same lack of prudent process.

152. A Committee that follows a prudent process would not consistently, and almost exclusively, select higher cost and lower performing options for its Plan participants.

### F. The Virtua Defendants Imprudently Selected and Retained Historically Underperforming Investment Options

153. Given the Virtua Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment

options substantially underperformed their benchmarks (as well as lower-cost alternative investments that were available to the Plans).

154. Prudent fiduciaries of large defined contribution plans must regularly analyze each of their plan's actively managed investment options to determine whether such funds will outperform their benchmark index, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class or substitute it with another investment.

155. The Virtua Defendants, however, failed to undertake such an analysis when they selected and retained the underperforming actively managed funds discussed in detail herein. The Virtua Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

156. Had such an analysis been conducted by the Virtua Defendants, operating within the ordinary scope of their fiduciary duty of prudence, they would have determined that the actively managed funds discussed herein underperformed their respective benchmark indices over extended periods of time. Indeed, the funds discussed below have demonstrated persistently poor performance for many years

compared to the benchmarks that are used as the appropriate yardsticks to evaluate these fund's investment results.

157. The Virtua Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had the Virtua Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

158. Among the Plans' perennial underperforming investment options is the Oakmark International Institutional, which, on information and belief, has an unreasonably high expense ratio of 0.810 %, as compared to comparable funds such as Vanguard International Value Inv., which has an expense ratio of 0.390 % (*i.e.*, a difference of as much as 0.420 %). Such excessive fees alone make the Oakmark International Institutional fund imprudent.

159. However, the imprudence of maintaining the Oakmark International Institutional fund is exacerbated by its poor performance relative to its benchmark index (the Morningstar Gbl xUS Val TME NR USD), as well as far less expensive

target retirement date investment options that were readily available throughout the Class Period, like Vanguard International Value Inv., the American Beacon International Eq R6, the DFA International Value III, and the JPMorgan Developed International Value R5 funds. While the Oakmark International Institutional fund underperformed its benchmark index and Morningstar fund category (*i.e.*, the Morningstar Foreign Large Value fund category) for the 1-, 3-, 5-, and 10-year periods ending on June 30, 2024, the comparable Vanguard International Value Inv., the American Beacon International Eq R6, the DFA International Value III, and the JPMorgan Developed International Value R5 funds mirrored or surpassed the performance of the same benchmark index and Morningstar fund category.

160. Given such prolonged underperformance, it was imprudent for the Virtua Defendants to retain the Oakmark International Institutional fund as an investment option in the Plans, as shown in **Table 6** below:

| In Plan/ Low Fee Alternative | Fund and Benchmark | Net Expense Ratio | Average Annual Return (%) | | | |
|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | OANIX<br>**Oakmark International Institutional**<br>**Category:**<br>Foreign Large Value<br>**Benchmark Index:**<br>Morningstar Gbl xUS Val TME NR USD | 0.81% | -2.80<br><br>Category<br>10.87<br><br>Index<br>13.23 | -2.47<br><br>Category<br>3.65<br><br>Index<br>3.94 | 4.12<br><br>Category<br>6.13<br><br>Index<br>5.98 | 2.84<br><br>Category<br>3.25<br><br>Index<br>3.49 |
| *Low Fee Alternative* | VTRIX<br>**Vanguard International Value Inv**<br>**Category:**<br>Foreign Large Value<br>**Benchmark Index:**<br>Morningstar Gbl xUS Val TME NR USD | 0.39% | 6.16<br><br>Category<br>10.87<br><br>Index<br>13.23 | 1.14<br><br>Category<br>3.65<br><br>Index<br>3.94 | 5.89<br><br>Category<br>6.13<br><br>Index<br>5.98 | 3.56<br><br>Category<br>3.25<br><br>Index<br>3.49 |
| *Low Fee Alternative* | AAERX<br>**American Beacon International Eq R6**<br>**Category:**<br>Foreign Large Value<br>**Benchmark Index:**<br>Morningstar Gbl xUS Val TME NR USD | 0.70% | 9.82<br><br>Category<br>10.87<br><br>Index<br>13.23 | 4.53<br><br>Category<br>3.65<br><br>Index<br>3.94 | 6.14<br><br>Category<br>6.13<br><br>Index<br>5.98 | 3.42<br><br>Category<br>3.25<br><br>Index<br>3.49 |
| *Low Fee Alternative* | DFVIX<br>**DFA International Value III**<br>**Category:**<br>Foreign Large Value<br>**Benchmark Index:**<br>Morningstar Gbl xUS Val TME NR USD | 0.25% | 13.52<br><br>Category<br>10.87<br><br>Index<br>13.23 | 7.27<br><br>Category<br>3.65<br><br>Index<br>3.94 | 8.20<br><br>Category<br>6.13<br><br>Index<br>5.98 | 4.40<br><br>Category<br>3.25<br><br>Index<br>3.49 |
| *Low Fee Alternative* | JPVRX<br>**JPMorgan Developed International Value R5**<br>**Category:**<br>Foreign Large Value<br>**Benchmark Index:**<br>Morningstar Gbl xUS Val TME NR USD | 0.65% | 18.46<br><br>Category<br>10.87<br><br>Index<br>13.23 | 7.77<br><br>Category<br>3.65<br><br>Index<br>3.94 | 7.85<br><br>Category<br>6.13<br><br>Index<br>5.98 | 3.36<br><br>Category<br>3.25<br><br>Index<br>3.49 |

161. The Plans' underperforming investment options also include the Goldman Sachs Small Cap Value R6, which is one of the Plan's oldest investments,

demonstrating that the imprudent process began a long time ago and persisted to the present.

162. This fund was selected/retained by the Committee and Sub-Committee on or before their first electronic reporting to the government for the 2009 calendar year (the first of the Defendant's electronic certifications/filings to the U.S. Departments of Treasury and Labor). On December 31, 2009, the fund held $1,957,577 in participants' savings. At the end of 2019, it contained $17,193,566 of Plan participants' saved wages.

163. However, the Goldman Small Cap Value fund should never have been added in 2009 or later. In the plan year 2009, the Goldman fund violated the "Active Evaluation Criteria" of the IPS Appendix B (page 10) because it was not a "Value" mutual fund—it was a "Blend" of value stocks and growth stocks.

164. Also, in the 2009 Plan year, the alpha was negative or a loss versus the fund's appropriate broad-based securities market index over the prior five and ten years. Over five years, the Morningstar US Small Value TR USD benchmark earned 2.13% per year, but the Goldman Small Cap Value fund's return was negative -0.18%, and over ten years the benchmark made 10.2% per year while the Goldman fund gained 9.6% per year.

165. In essence, this means that investors in this fund paid additional management fees to receive lower returns than the cheaper unmanaged benchmark index.

166. The Goldman Small Cap Value fund's name has been small value since its inception, but from 2013 to 2018, the portfolio manager deviated from that sector and only held an average of 27% in value stocks. This style drift violated the IPS, but again, the Committee and Sub-Committee did not have prudent processes at play to notice this and the other reasons to avoid Goldman manager.

167. The Committee and Sub-Committee sat idly by as the Plans' participants spent almost $2 million in fees for the Goldman portfolio manager to try and beat his appropriate broad-based securities market index—which he predictably did not. At no point in time did the Committee and Sub-Committee have any reason to believe that this manager and fund would actually beat the substantially less expensive benchmark given this fund's historical performance as outlined above. Nor did the Committee and Sub-Committee notice or care that the manager continued to fail to beat its benchmark after they retained this fund.

168. The Committee and Sub-Committee egregiously failed to avoid unwarranted and unnecessary costs and failed to prudently investigate the potential of the participants' extra costs to produce enhanced returns for them and the Plan and Trust.

169. The Restatement of the Law of Trusts (Third) warned that if "the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations. Here, given this manager's historical performance, there was no justification for extra costs and risks.

**Table 7: Participants' Total Cost for the Committee's Goldman Choice**

| Plan year (Goldman added to menu before 2009) | Goldman Sachs SCV Participants' $ | SEC Turnover Costs | SEC Fund Costs |
|---|---|---|---|
| 2023 | $11,111,619.00 | $30,001.37 | $110,005.03 |
| 2022 | $11,189,347.00 | $38,043.78 | $107,417.73 |
| 2021 | $13,465,872.00 | $64,636.19 | $127,925.78 |
| 2020 | $18,975,779.00 | $96,776.47 | $180,269.90 |
| 2019 | $17,193,566.00 | $68,774.26 | $159,900.16 |
| 2018 | $13,725,359.00 | $71,371.87 | $127,645.84 |
| 2017 | $17,203,304.00 | $58,491.23 | $163,431.39 |
| 2016 | $10,619,471.00 | $36,106.20 | $97,699.13 |
| 2015 | $9,977,642.00 | $45,897.15 | $94,787.60 |
| 2014 | $7,646,481.00 | $43,584.94 | $74,935.51 |
| 2013 | $11,128,589.00 | $63,432.96 | $109,060.17 |
| **Cost Grand Total: $1,970,194.66** | **$142,237,029** | $617,116 | $1,353,078 |

170. These egregious oversights are indicative of the Committee and Sub-Committee failing to implement or follow prudent processes at all relevant times.

171. After over a decade of underperformance, the first time the fund was discussed in the Committee's meeting minutes was in October of 2021. Somehow,

the obvious 2009 to 2020 underperformance and risks of future underperformance were not mentioned.

172. The best metric to judge portfolio manager risk versus reward is a fund's information ratio. The Goldman Small Cap Value fund's average information ratio (IR), in 2009, over the prior five years, was near zero (0.014).

> Information ratio measures the fund's performance relative to its benchmark and adjusts it for market volatility. **If the ratio is between 0.61 and 1, then it is a great investment.** Information ratio is extremely useful in comparing a group of funds with similar management styles.[15]

173. This metric measures an investment's performance relative to its benchmark and adjusts it for market volatility. The Goldman Small Cap Value's information ratio (IR) from 2018 back to 2013 was -0.590, -0.050, 0.040, 0.130, 0.550 and 0.450, respectively. If the portfolio manager's ratio lies between 0.61 and 1, then it is a great investment. Hence, the Goldman fund was not. The Committee and Sub-Committee failed to notice that this fund never achieved a good IR and also failed to notice the tremendous downward trending free fall of this fund into negative IR range. From 2013 to 2018, Goldman's average information ratio (IR) over the prior five years was not even close to the range of 0.61 to 1.

[15] https://www.financialexpress.com/money/mutual-funds-what-information-ratio-tells-about-your-fund-managers-performance-1512745/#:~:text=Information%20ratio%20measures%20the%20fund%E2%80%99s%20performance%20relative%20to,a%20group%20of%20funds%20with%20similar%20management%20styles.

174. Unsurprisingly, this trend continued, and the IR never recovered from negative numbers. From 2023 back to 2019 the IR of this Goldman fund was -0.61, -0.600, -0.910, -0.680 and -0.610, respectively. Thus, the fund should never have been added or retained on the participants' menu, and/or swiftly eliminated upon imprudent selection, however, neither action was taken by the Committee and Sub-Committee.

175. Moreover, the Goldman Sachs Small Cap Value's expense ratio of 0.990 % is unreasonably high as compared to comparable funds such as DFA US Small Cap I, which has an expense ratio of 0.270 % (*i.e.*, a difference of as much as 0.720 %). Such excessive fees alone make the Goldman Sachs Small Cap Value fund imprudent to maintain.

176. However, the imprudence of the Goldman Sachs Small Cap Value fund is exacerbated by its poor performance relative to its benchmark index (the Morningstar US Small Extended TR USD), as well as less expensive small cap value investment options that were readily available throughout the Class Period, like DFA US Small Cap I, Schwab Fundamental US Small Company Idx, Columbia Small Cap Index Inst3, and BNY Mellon Small Cap Stock Index I funds. While the Goldman Sachs Small Cap Value fund underperformed its benchmark index for the 1-, 5-, and 10-year periods ending on September 30, 2024, and its Morningstar fund category (*i.e.*, the Morningstar Small Blend fund category) for the 1-, 3-, 5-, and 10-

year periods ending on September 30, 2024, the comparable DFA US Small Cap I, Schwab Fundamental US Small Company Idx, Columbia Small Cap Index Inst3, and BNY Mellon Small Cap Stock Index I funds mirrored or surpassed the performance of the same benchmark index and Morningstar fund category.

177. Given such prolonged underperformance, it was imprudent for the Virtua Defendants to retain the Goldman Sachs Small Cap Value fund as an investment option in the Plans, as shown in **Table 8** below:

| **In Plan/ Low Fee Alternative** | **Fund and Benchmark** | **Net Expense Ratio** | **Average Annual Return (%)** | | | |
|---|---|---|---|---|---|---|
| | | | **1Y** | **3Y** | **5Y** | **10Y** |
| **IN PLAN** | GSSUX<br>**Goldman Sachs Small Cap Value R6**<br>**Category**:<br>Small Blend<br>**Benchmark Index:**<br>Morningstar US Small Extended TR USD | 0.99% | 22.62<br><br>Category 25.03<br><br>Index 26.33 | 3.17<br><br>Category 4.42<br><br>Index 2.99 | 7.29<br><br>Category 10.20<br><br>Index 9.67 | 7.22<br><br>Category 8.63<br><br>Index 8.72 |
| *Low Fee Alternative* | DFSTX<br>**DFA US Small Cap I**<br>**Category**:<br>Small Blend<br>**Benchmark Index:**<br>Morningstar US Small Extended TR USD | 0.27% | 26.09<br><br>Category 25.03<br><br>Index 26.33 | 6.62<br><br>Category 4.42<br><br>Index 2.99 | 12.18<br><br>Category 10.20<br><br>Index 9.67 | 9.64<br><br>Category 8.63<br><br>Index 8.72 |
| *Low Fee Alternative* | SFSNX<br>**Schwab Fundamental US Small Company Idx**<br>**Category**:<br>Small Blend<br>**Benchmark Index:**<br>Morningstar US Small Extended TR USD | 0.25% | 24.76<br><br>Category 25.03<br><br>Index 26.33 | 5.79<br><br>Category 4.42<br><br>Index 2.99 | 11.15<br><br>Category 10.20<br><br>Index 9.67 | 9.52<br><br>Category 8.63<br><br>Index 8.72 |
| *Low Fee Alternative* | CSPYX<br>**Columbia Small Cap Index Inst3**<br>**Category**: | 0.20% | 25.67<br><br>Category | 3.78<br><br>Category | 9.98<br><br>Category | 9.82<br><br>Category |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Small Blend<br>**Benchmark Index:**<br>Morningstar US Small Extended TR USD | | 25.03<br><br>Index<br>26.33 | 4.42<br><br>Index<br>2.99 | 10.20<br><br>Index<br>9.67 | 8.63<br><br>Index<br>8.72 |
| *Low Fee Alternative* | DISIX<br>**BNY Mellon Small Cap Stock Index I**<br>**Category:**<br>Small Blend<br>**Benchmark Index:**<br>Morningstar US Small Extended TR USD | 0.25% | 25.65<br><br>Category<br>25.03<br><br>Index<br>26.33 | 3.74<br><br>Category<br>4.42<br><br>Index<br>2.99 | 10.00<br><br>Category<br>10.20<br><br>Index<br>9.67 | 9.77<br><br>Category<br>8.63<br><br>Index<br>8.72 |

178. The underperformance of the Goldman Sachs Small Value Cap fund is also demonstrated by a comparison to its benchmark index, as shown in the table below:

**Table 9: 2019 Lookback at Goldman Sachs Small Cap Value Benchmark Underperformance**

| Name (data as of 1/1/2019) | Treynor 1-year | Treynor 3-year | Treynor 5-year | Treynor 10-year |
|---|---|---|---|---|
| S&P SmallCap 600 TR USD | -9.13 | 6.80 | 5.08 | 11.19 |
| Goldman Sachs Small Cap Value R6 | -16.17 | 4.63 | 3.09 | 10.52 |

179. The Committee's lack of a prudent process and breach of fiduciary duties in failing to monitor the Plans' investments is demonstrated by the Committee's inability to recognize the decade-long underperformance of their selected Goldman Sachs Small Value Cap fund.

180. If the Committee and Sub-Committee followed the IPS metrics and reviewed its Goldman Sachs Small Value Cap fund at any time, it should have come to the obvious conclusion that this fund needed to be removed from the Plans.

181. The Plan's menu of investments included the Goldman Sachs Small Cap Value fund from 2009 to 2023, during which time this fund's Style drift or deviation of investments was noted on seven instances in the Committee's meeting minutes, however, the Committee failed to note IPS criteria number 10 (IPS page 10), style deviation of the Goldman Sachs Small Cap Value fund. The IPS Appendix B criteria number 10 "Investment Style is consistent with the fund's objectives" requires the style to match the prospectus objective. The Goldman Sachs Small Cap Value fund's drift or deviation was present for over a decade, however, the Committee was either unaware of their own IPS guidelines or they chose to disregard them.

182. Another example of the lack of prudent monitoring processes of the Committee and Sub-Committee is the retention of the MetWest fund as both a direct option and as part of the Lifespan models for Plan participants.

183. After imprudently adding the MetWest fund in 2015, the Committee consistently failed to monitor this fund.

184. In 2019, the Metropolitan West Total Return Bond Fund's managers' alpha or performance v. peers lagged behind their peers by a median of 63 basis points per annum (-0.63%) for plan years 2018 back to 2014.

185. From the plan year 2018, back ten years to the 2009 plan year, the managers lagged behind peers again by a loss of one hundred and fifty-one basis

points (-1.51%) each year. Geometric mean returns were worse at a loss of 67 basis points (-0.67%) over the earlier five years (2018 back to 2014) to peer bond funds (Corporate Bond Cat. Avg) and a loss each year of 395 basis points (-3.95%) to peers annually over the prior ten years.

186. Yet again, because the Committee and Sub-Committee failed to follow prudent processes in monitoring investment options of the Plans' participants, they were unable to discover or disregarded this consistent underperformance.

187. Impact of the Committee's plan-wide imprudent decision-making and failure to monitor cannot be overstated.

188. The Plan and Trust held $73,052,523 on January 1, 2019 (of participants' retirement saving balances in Virtua's Plan in the Metropolitan fund). From January 1, 2019 to September 30, 2024, the participants' dollars in the Metropolitan West Total Return Bond Fund grew less than the Corporate Bond Cat. Avg by an amount of ($6,120,152). The geometric mean alpha over the period was a loss of 1.34% each year for almost six years.

189. Thus, participants in this fund would have had over six million dollars more in their accounts but for the Committee's initial thoughtless and poor decision-making after the plan year 2015. Their failure to both prudently select and prudently monitor costs the older bond fund investors who sought safety over growth.

190. Participants who were terminated over the past six years and had taken withdrawals totaled $276,040,645. More specifically, they cashed out all their investments and locked in losses that they had to withdraw:

| | |
|---|---|
| 2023 | 53,775,695 |
| 2022 | 45,280,903 |
| 2021 | 52,001,110 |
| 2020 | 44,662,270 |
| 2018 | 35,779,831 |
| 2019 | 44,540,836 |

191. The Committee's failure to follow prudent processes in selection and monitoring their selections similarly damaged the Plan's TDF sector.

192. The Committee's TDF selection consistently lagged behind its peers.

**Table 10: The 2025 Lifespan Model vs. Peers**

| **Defendants' 2025 Model versus Peers (as of 12/31/2019)** | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| Target-Date 2025 Peer Average | 4.80 | 18.47 | 18.47 | 8.84 | 6.40 |
| **Loss/Difference** | **-1.36** | **-5.02** | **-5.02** | **-2.07** | **-0.51** |

| **Defendants' 2025 Model versus Largest Peers (as of 12/31/2019)** | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| American Funds 2025 Trgt Date Retire R6 | 5.65 | 17.85 | 17.85 | 9.47 | 7.12 |
| **Loss/Difference** | **-2.21** | **-4.40** | **-4.40** | **-2.70** | **-1.23** |

| **Defendants' 2025 Model versus Largest Peers (as of 12/31/2019)** | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%) | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| T. Rowe Price Retirement 2025 | 5.80 | 20.95 | 20.95 | 10.34 | 7.60 |
| **Loss/Difference** | **-2.36** | **-7.50** | **-7.50** | **-3.57** | **-1.71** |

| **Defendants' 2025 Model versus Largest Peers (as of 12/31/2019)** | 3-mo | YTD | 1-Year | 3-Year | 5-Year |
|---|---|---|---|---|---|
| 2025 Lincoln Lifespan Rate of Return (%)" | 3.44 | 13.45 | 13.45 | 6.77 | 5.89 |
| Vanguard Target Retirement 2025 Inv | 5.22 | 19.63 | 19.63 | 9.57 | 6.99 |
| **Loss/Difference** | **-1.78** | **-6.18** | **-6.18** | **-2.80** | **-1.10** |

193. The Committee's selection consistently lost out to its peers and the peer average, and like across the other options included in the plan, on a plan-wide basis, the Committee lacked prudent processes to monitor and identify when action was required of them to stop the bleed.

194. The Committee's process was consistently tainted with failure of effort, competence, or loyalty on a plan-wide basis.

195. The damage caused to Plan participants by the imprudent processes of the Committee in the TDF sector is immense, approximately $30 million to $35 million dollars[16].

[16] The exact amount of damages caused by the Committee's imprudent decisions surrounding TDFs cannot be calculated at this time because Defendants have denied Plaintiff's request for totals in each Lifespan model.

### G. The Virtua Defendants Failed to Monitor Excessive Compensation Paid to the Lincoln Defendants for Recordkeeping and Administrative Fees

196. The Virtua Defendants have a duty to prudently select and monitor compensation paid to covered service providers. Courts that have considered the issue have made it clear that a fiduciary must ensure that "no more than reasonable compensation is paid" for a party in interest's services, and that a fiduciary must "consider the compensation received by the party 'from all sources in connection with the services it provides to a covered plan pursuant to' the contract, not just the compensation the party receives directly from a plan." *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (quoting 29 C.F.R. § 2550.408b-2(a)(3)).

197. Here, that means the Virtua Defendants "needed to consider the compensation" that the Lincoln Defendants received from all sources "when determining whether 'no more than reasonable compensation' was paid for [Lincoln's] services." *Bugielski*, 76 F.4th at 912 (9th Cir. 2023) (quoting 29 C.F.R. § 2550.408b-2(a)(3)).

198. The U.S. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[17] The DOL has observed that:

> [T]he responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the

[17] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

> reasonableness of the fees charged in light of the services provided. In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….
>
> Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be able to demonstrate compliance with ERISA's fiduciary standards.

199. Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plans and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

200. The cost of recordkeeping services typically depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

201. When selecting a recordkeeper, a fiduciary of a large plan like the Plans at issue must solicit competitive bid proposals from several recordkeepers in order to obtain the best possible price. The plan fiduciary should require the recordkeeper to identify not only the recordkeeping services and their cost, but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plans must select.

202. To monitor recordkeeping costs, it is customary that a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper selected charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, or revenue share from mutual funds, among other sources.

203. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of

approximately three years and monitor recordkeeping costs regularly within that period.

204. In this case, based on information currently available to Plaintiffs regarding the Plan's features and the nature of the administrative services provided by Lincoln, the Plan's active participant level was between 7,612 and 11,240 during the Class Period. Based on the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan should have been no more than **$35** per participant per year for the Class Period.[18]

205. Here, however, the Virtua Defendants allowed the Lincoln Defendants to receive compensation for providing administrative services that was far greater than $35 per participant per year.

---

[18] *See* 17th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2022 (March 2023), available at: https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf; *see also* 16th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2021 (February 2022), available at: https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf; 15th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2020, available at: NEPC-Horizontal-InvestorForce-Compatible.pptx (hubspotusercontent00.net); 14th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2029, available at: https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf

206. Specifically, in addition to revenue sharing and spread income from the Stable Value Account, as of 2017, the Lincoln Defendants charged an asset-based fee of sixteen basis points (0.16%) for recordkeeping services,[19] which it calculated quarterly based four basis points (0.04%) of the averages of the opening and closing balances in the Plan for each calendar quarter. *See* Third Restated Recordkeeping Service Agreement (July 1, 2017), at Exhibit C. Under the Service Agreement, these fees may be partially offset by revenue the Lincoln Defendants received on investments.

207. Participant Disclosure Notices issued during the Class Period reported that Plan participants would be charged $7.00 per quarter (*i.e.*, $28 per participant per year) for administrative services, including recordkeeping. However, the amount of compensation that the Lincoln Defendants actually received for providing such services to the Plan was roughly 4 to 6 times greater than $28 per participant. Indeed, as shown in the table below, the fee income that the Lincoln Defendants received from the Plan was, by any measure, unreasonable and excessive:

[19] Certain documents produced by the Virtua Defendants suggest that Lincoln's recordkeeping fee was 14 bps during 2018-2019. Either amount, however, is excessive.

**Table 11: Recordkeeping and Administrative Fees Received by Lincoln Retirement**

| YEAR | ACTIVE PLAN PARTICIPANTS AT YEAR END | TOTAL PLAN ASSETS AT YEAR END | LINCOLN ANNUAL RECORDKEEPING FEE AT 14 BPS | DIRECT FEES TO LINCOLN REPORTED ON FORMS 5500 | TOTAL ADMIN FEES TO LINCOLN | PER PARTICIPANT COMPENSTION TO LINCOLN |
|---|---|---|---|---|---|---|
| 2018 | 7,612 | $ 485,599,548.00 | $ 679,839.37 | $ 207,088.00 | $ 886,927.00 | $ 116.52 |
| 2019 | 11,186 | $ 657,246,982.00 | $ 920,149.98 | $ 216,659.00 | $ 1,136,808.98 | $ 101.63 |
| | | | FEE AT 16 BPS | | | |
| 2020 | 11,031 | $ 775,387,757.00 | $ 1,240,620.41 | $ 336,278.00 | $ 1,576,898.41 | $ 142.95 |
| 2021 | 11,515 | $ 891,452,556.00 | $ 1,426,324.09 | $ 451,280.00 | $ 1,877,604.09 | $ 163.05 |
| 2022 | 11,240 | $ 826,325,527.00 | $ 1,322,120.84 | $ 565,484.00 | $ 1,887,604.84 | $ 167.93 |

208. In addition to direct compensation paid to the Lincoln Defendants for recordkeeping services to the Plan, the Plan's annual form 5500 filings indicate that the Lincoln Defendants received indirect compensation from revenue sharing arrangements with certain funds offered by the Plans, particularly the Stable Value Account as set forth above, as well as substantial spread income on the Stable Value Account as set forth above. Plaintiffs estimate that the spread income that the Lincoln Defendants received from the Stable Value Account ranged from a low of $1,624,189.37 in 2018 to a high of $2,831,500.45 in 2022. The Virtua Defendants failed to consider the additional compensation that the Lincoln Defendants received from spread income on the Stable Value Account in determining whether the total compensation that the Lincoln Defendants received was reasonable, and indeed, it was not.

209. When the administrative fees in the table above are combined with the 55-basis points revenue sharing payments that the Lincoln Defendants received from

the Stable Value Account, the total compensation that the Lincoln Defendants received – not including the substantial spread income earned by depositing these Plan assets in Lincoln's general account – is truly staggering, as shown in **Table 12** below:

| YEAR | ASSETS IN STABLE VALUE ACCT. AT YEAR END | INDIRECT REVENUE SHARING FROM STABLE VALUE ACCT. (55 BPS) | LINCOLN'S TOTAL ANNUAL COMPENSATION |
|---|---|---|---|
| | | | |
| 2018 | $ 116,389,472.00 | $ 640,142.09 | $ 1,624,189.37 |
| 2019 | $ 138,873,530.00 | $ 763,804.41 | $ 2,032,058.58 |
| 2020 | $ 164,252,057.00 | $ 903,388.43 | $ 2,480,286.84 |
| 2021 | $ 172,028,443.00 | $ 946,156.44 | $ 2,823,760.53 |
| 2022 | $ 171,617,383.00 | $ 943,895.61 | $ 2,831,500.45 |

210. The Lincoln Defendants' total annual compensation for just the five years indicated in the table above totals **$11,791,795.80**.

211. Even if the revenue sharing payments that the Lincoln Defendants received from the Stable Value Account were credited against the 14 to 16 basis points that the Lincoln Defendants charged for recordkeeping services to the Plans, the total compensation that the Lincoln Defendants received averaged approximately **$138** per participant per year during the Class Period, which is nearly ***four times*** the reasonable recordkeeping fee of $35 per participant for the Class Period.

212. Additionally, the Virtua Defendants agreed that any time that Plan participants deposit or withdraw money from their individual accounts, the funds

will first pass through the Lincoln Defendants' clearing account. The Virtua Defendants also agreed that the Lincoln Defendants could, as part of its compensation for service provided to the Plans, keep all interest or investment returns earned on Plan participant money while the money is in Lincoln's clearing account. This is yet another form of indirect compensation that the Lincoln Defendants receive as the recordkeeper for the Plan pursuant to its arrangement with the Virtua Defendants.

213. There is nothing *per se* imprudent about this arrangement. The DOL has expressly approved this type of arrangement but requires fiduciaries like the Virtua Defendants to negotiate, monitor, and factor into a recordkeeper's compensation the earnings that a recordkeeper makes on the float. *See* U.S. Department of Labor Field Assistance Bulletin No. 2002-03, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on March 5, 2025.

214. Here, the Virtua Defendants failed to negotiate, monitor, or factor into the Lincoln Defendants' compensation the earnings that the Lincoln Defendants receive via float. In fact, Lincoln's earnings on float alone were likely sufficient to cover a substantial portion of the reasonable administrative expenses for services provided to the Plans.

215. The Virtua Defendants should have been aware of this potential for abuse and monitored for it. They failed to do that and the Class members suffered because of it. Every dollar of unreasonable recordkeeping fees cost participants a retirement dollar that was no longer available for investment, including further growth and compounding.

### H. The Committee Breached its Duty of Loyalty by not Acting in the Sole Interest of Plans' Participants and by Failing to Pursue Financial Benefit for the Plans' Participants

216. Under ERISA's duty of loyalty, a plan fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of benefitting them. *See* 29 U.S.C. § 1104(a)(1)(A)(i). This sole interest rule is a codification of what is found in the common law of trusts. It creates a very specific and narrow path for an ERISA plan manager when considering an investment strategy or providing mutual fund selections for self-directed individual accounts. ERISA fiduciaries have a duty to the beneficiaries and participants not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the ERISA plan—they must act with an "eye single" to the interests of the plan participants. Restatement (Third) of Trusts § 78(1) cmt. F. (Am. Law Inst. 2007).

217. Perhaps the most fundamental duty of a [fiduciary] is that he must display … complete loyalty to the interest of the beneficiary and must exclude all

selfish interest and all consideration of the interests of third persons. An ERISA plan manager who is influenced by his own or a third party's interests is disloyal because the ERISA plan manager is no longer acting solely in the interests of the beneficiaries. Here, the Committee consistently selected and kept underperforming funds that carried high manager fees for inexplicable reasons. The Committee's actions were not in the sole interest of plan participants and beneficiaries and thereby violate the duty of loyalty.

218. When the Committee acts to benefit anyone else outside of the Plans' participants it is breaching their duty of loyalty.

219. Similarly, the Committee failed and ignored its duty to pursue financial benefits for the Plans' participants.

220. Based on the U.S. Supreme Court's interpretation of the statutory language, "providing benefits to participants and their beneficiaries," a fiduciary's duty of loyalty also requires an exclusive focus on the pursuit of financial benefits:

> "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." Read in the context of ERISA as a whole, the term "benefits" in the provision just quoted must be understood to refer to the sort of financial benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries.

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420-21 (2014) (quoting 29 U.S.C. § 1104(a)(1)(A)(i)-(ii)). "The term ['benefits'] does not cover nonpecuniary benefits." *Id.* at 421. Therefore, ERISA's duty of loyalty mandates the pursuit of

financial benefits for the plan participants and beneficiaries and does not allow for the pursuit of nonfinancial or nonmonetary benefits, even if plan participants and beneficiaries approve.

221. This means that even if ERISA plan documents state that other objectives could or must be pursued, such as cleaning up the environment, raising labor wages, excluding investments that involve alcohol, guns, or tobacco, etc., making the workplace safer, providing better medical benefits for employees, or solving the world's social or political problems, no matter how worthy the objective, this conflicts with ERISA's fiduciary duties and is void as a matter of public policy. *See Fifth Third Bancorp*, 573 U.S. at 421 ("With irrelevant exceptions, 'any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility … for any … duty under this part shall be void as against public policy'" (citing 29 U.S.C. § 1110(a)).

222. To comply with its fiduciary duties, an ERISA plan manager must have the sole focus of pursuing the highest risk-adjusted financial return possible for plan participants and beneficiaries. If this does not occur because the Committee selected funds and managers with excessive fees and poor performance, the Committee breaches its fiduciary duty of loyalty.

223. Here, the Committee consistently selected and kept options with excessive fees and poor risk adjusted return.

### I. Defendants Engaged in Prohibited Transaction by Allowing Excessive Advisory Payments.

224. Prohibited transaction claims under ERISA § 406(a) are per se violations of ERISA.

225. When selecting investments for a retirement plan, plan fiduciaries are required to act with undivided loyalty and prudence, and defray reasonable plan expenses. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). In addition, ERISA prohibits certain transactions and arrangements that have a high potential for abuse. Thus, ERISA prohibits a fiduciary from causing a plan to transact with a party in interest, such as the plan sponsor, and prohibits plan fiduciaries from causing plan transactions for the benefit of themselves or others. ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).

226. Prohibited transaction claims under ERISA § 406(a) are "per se violations of ERISA" and, thus, not derivative of breach of fiduciary duty claims. *Liss v. Smith*, 991 F. Supp. 278, 307 n.30 (S.D.N.Y. 1998). Likewise, ERISA § 406(b) is broadly construed and "liability be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith[.]'" *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (quotation omitted).

227. Fiduciary status is determined broadly by function, not title; also:

> … The term [fiduciary] includes anyone who exercises discretion in the management of assets, renders investment advice for a fee, or possesses discretionary authority with regard to plan administration. The

> broadness of the definition is readily apparent. Plan officers, directors, and members of the investment or administrative committee are certainly fiduciaries since they exercise discretionary authority or control over plan management and asset disposition. Similarly, officers and directors of the plan sponsor are fiduciaries if they exercise control through the selection of the investment committee, administrative committee, or plan officers or directors. Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: … attorneys who counsel the employer, investment committee, or trustee with regard to an appropriate portfolio mix or with regard to specific investments and receive a fee for these services; … [and] … stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of these securities and receive a commission for their services. (Footnotes omitted.)

Little and Thrailkill, *Fiduciaries Under ERISA: A Narrow Path to Tread*, 30 Vanderbilt L.Rev. 1, 4-5 (1977)).

228. Based on the IPS and meeting minutes here, the Financial Industry Regulatory Authority ("FINRA") individual representative worked in 2018 to 2023 as the advisor of record and all his services were the same.[20] Also, based on Virtua's governmental reporting, the Schedule C services were no different (UBS first hired in 2010). Their services were fiduciary in nature.

229. Based on Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017), the maximum principal hourly rate is $300. This Plan and Trust holds about two dozen investments (nine of which changed from 2018 to 2023). Nine investment changes occurred since 2018, so that equals an average of two changes per year. The

[20] This is typical for the industry.

average time for a Registered Investment Adviser ("RIA") firm to research a replacement is about one business day, or eight hours. Reviewing two dozen investments takes about two hours each or a total of 24 hours. Twenty-four hours for existing Virtua funds per quarter plus the four hours for changes (2 funds times 8 divided by 4 quarters) equals 32 hours or $9,600 (32 times 300).

230. ERISA only allows trust deductions for a covered service provider if they are necessary for the plan's operation. If necessary, they can be paid from the trust at a reasonable rate of pay. Even if given a pass for necessity, they still failed in the second requirement because they were paid twice the ~$40,000 highest rate in the industry for the specific services provided here. Non-principals are paid only $160 per hour, and most of the work here is performed by non-principals. The Committee inexcusably authorized double of that to be charged against the Plan participants.

231. At all relevant times, Defendants (and UBS/Morgan Stanley) were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets. Defendants who are or were fiduciaries to the Plan during the Class Period have violated their fiduciary duties and engaged in prohibited transactions with Plan assets.

## CLASS ACTION ALLEGATIONS

232. ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

233. Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs bring this case as a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs will seek to certify the following class, and to be appointed as the representatives ("Named Plaintiffs") on behalf of the following class:

> All current and former participants in or beneficiaries of the Virtua 401(k) Retirement Program a/k/a 401(k) Savings Plan (the "Plan") or the 403(b) Retirement Program a/k/a 403(b) Savings Plan (the "Program") from October 18, 2018 through the date of judgment, except the Virtua Defendants (the "Class").

234. This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

a. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide

substantial benefits to the parties and the Court. As of 2022, the Plan had 11,240 active participants.

b. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the many questions of law and fact common to the Class include, without limitation:

- whether the Virtua Defendants are fiduciaries of the Plans;
- whether the Virtua Defendants breached their fiduciary duty of prudence with respect to the Plans;
- whether the Virtua Defendants had a duty to monitor other fiduciaries of the Plans;
- whether the Virtua Defendants breached their duty to monitor other fiduciaries and parties of interest to the Plans; and
- the extent of damage sustained by Class members and the appropriate measure of damages.

235. Plaintiffs' claims are typical of those of the Class members because their claims arise from the same event, practice, and/or course of conduct as other members of the Class.

236. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general.

237. Plaintiffs have no interests that conflict with those of the Class.

238. The Virtua Defendants do not have any unique defenses against the Plaintiffs that would interfere with their representation of the Class.

239. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Breach of Fiduciary Duties**
**(Against The Virtua Defendants)**

240. Plaintiffs incorporate each allegation above as if fully set forth herein.

241. The Virtua Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). They were obligated to discharge their duties to the Plans and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

242. Common law and ERISA's duty of prudence required the Virtua Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plans and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

243. As described above, the Virtua Defendants failed to act prudently and in the best interest of the Plans and participants and breached their fiduciary duties in various ways. Specifically, among other failings, the Virtua Defendants (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; (ii) failed to prudently select and monitor the Plans' stable value fund; and (iii) failed to delegate their duties prudently, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out their investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

244. The Virtua Defendants knowingly participated in each fiduciary breach of the other Plans' fiduciaries, knowing that such acts were a breach, and enabled the other Plans' fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. The Virtua Defendants knew of the fiduciary breaches

of the Plans' fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each of the Virtua Defendants is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

245. The Virtua Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total losses to the Plans will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plans' participants to date.

246. As a direct and proximate result of these breaches, the Plans, Plaintiffs, and Class members suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced and are entitled to be made whole for their losses.

**COUNT II**
**Breach of Fiduciary Duty to Monitor Excessive Fees**
**(Against Virtua and the Board)**

247. Plaintiffs incorporate each allegation above as if fully set forth herein.

248. Virtua and the Board were obligated to discharge their fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plans. *See* 29 U.S.C. § 1104(a)(1)(A)(ii).

In investing and managing the Plans' assets, Virtua and the Board were permitted to incur only appropriate and reasonable costs.

249. Virtua and the Board failed to defray the Plans' recordkeeping expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plans' recordkeeping expenses were excessive, resulting in losses to the Plans' participants.

250. Virtua and the Board also knowingly participated in the breach of the duties of the other Virtua Defendants, knowing that such acts were a breach, enabled the other Virtua Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Virtua Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of each of its co-fiduciaries under 29 U.S.C. § 1105(a).

251. Virtua and the Board are liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total losses to the Plans will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plans participants to date.

## COUNT III
**Prohibited Transaction**
**(Against Virtua, the Committee, and Sub-Committee, and the Lincoln Defendants as Parties in Interest)**

252. Plaintiffs incorporate each allegation above as if fully set forth herein.

253. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

254. Virtua, the Committee and Sub-Committee were fiduciaries to the Plans.

255. Virtua, the Committee, and Sub-Committee caused the Plans to engage in the annuity transactions with knowledge that the transactions constituted a direct or indirect exchange of property between the Plans and the Lincoln Defendants.

256. Virtua, the Committee and Sub-Committee caused the Plans to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between the Lincoln Defendants and the Plans.

257. When Virtua, the Committee and Sub-Committee caused the Plans to engage in the annuity transactions, the Lincoln Defendants were parties in interest, including because the Lincoln Defendants were fiduciaries of the Plans and persons

providing services to the Plan. 29 U.S.C. § 1002(14). Virtua, the Committee and Sub-Committee knew of that fact when they caused the Plans to engage in the annuity transactions at issue.

258. Virtua, the Committee and Sub-Committee knowingly participated in the breach of fiduciary duties by the Lincoln Defendants, knowing that such acts were a breach, and enabled the Lincoln Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the Lincoln Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a) and would be liable even if they were deemed non-fiduciaries.

## COUNT IV
**Prohibited Transaction**
**(Against the Lincoln Defendants, Virtua, and the Committee as Parties in Interest)**

259. Plaintiffs incorporate each allegation above as if fully set forth herein.

260. The Lincoln Defendants were at all relevant times fiduciaries to the Plans.

261. The Lincoln Defendants caused the Plans to engage in the annuity transactions with knowledge that the transactions constituted a direct or indirect exchange of property between the Plans, on one hand, and Virtua and the Committee

and Sub-Committee, on the other hand; (ii) furnishing of services between the Plans and Virtua and the Committee and Sub-Committee; and (iii) the transfer to, or use by or for the benefit of Virtua and the Committee, of Plans assets.

262. When the Lincoln Defendants caused the Plans to enter into the annuity transactions, Virtua and the Committee and Sub-Committee were parties in interest, including because they were fiduciaries of the Plans and persons providing services to the Plans. 29 U.S.C. § 1002(14). The Lincoln Defendants knew of these facts when they caused the Plans to engage in the annuity transactions.

263. The Lincoln Defendants knowingly participated in the breaches of Virtua and the Committee and Sub-Committee, knowing that such acts were a breach, enabled breaches by Virtua and the Committee and Sub-Committee, by failing to lawfully discharge their fiduciary duties, knew of the breach by Virtua and the Committee and Sub-Committee, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, the Lincoln Defendants are liable for the losses to the Plans caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT V
## Violation of 29 U.S.C. § 1106(b) Prohibited Transactions Against Virtua, the Committee and Sub-Committee (UBS/Morgan Stanley as Parties in Interest)

264. Plaintiffs incorporate each allegation above as if fully set forth herein.

265. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

266. Defendants Virtua, the Committee and Sub-Committee were fiduciaries to the Plans at all relevant times.

267. Defendants Virtua, the Committee and Sub-Committee caused the Plans to engage in the annuity transactions with knowledge that the transactions constituted a direct or indirect exchange of property between the Plans and UBS/Morgan Stanley.

268. When Virtua, the Committee and Sub-Committee caused the Plans to engage in the services of UBS/Morgan Stanley on behalf of the Plans, UBS/Morgan Stanley were parties in interest, including because UBS/Morgan Stanley were persons providing services to the Plan. 29 U.S.C. § 1002(14). Virtua, the Committee and Sub-Committee knew of that fact when they caused the Plans to engage the services provided by UBS/Morgan Stanley at issue.

269. Virtua, the Committee and Sub-Committee knowingly participated in the breach of fiduciary duties by UBS/Morgan Stanley, knowing that such acts were a breach, and enabled UBS/Morgan Stanley's commission of a breach by failing to

lawfully discharge their fiduciary duties, knew of the breach by UBS/Morgan Stanley, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a) and would be liable even if they were deemed non-fiduciaries.

270. In doing so, Defendants dealt with the assets of the Plans in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

271. In doing so, Defendants also acted adverse to the interests of the Plans and the Plans' participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

272. And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plans, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

273. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of the Plans and proposed Class members, respectfully request that the Court:

a) Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appoint Plaintiffs as the Class Representatives;

b) Find and declare that the Virtua Defendants breached their fiduciary duties as described above;

c) Find and adjudge that the Virtua Defendants are liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties alleged herein, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty as alleged herein;

d) Determine the method by which the Plans' losses under 29 U.S.C. §1109(a) should be calculated;

e) Order all Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

f) Impose a constructive trust over these profits;

g) Apportion all amounts recovered for the Plans among the Plaintiffs and the Class;

h) Order the Virtua Defendants to provide an accounting necessary to determine the amounts that the Virtua Defendants must make good to the Plans under §1109(a);

i) Surcharge against the Virtua Defendants and in favor of the Plans all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

j) Order that any amount to be paid to the Plans and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

k) Award to Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

l) Order the payment of prejudgment and post-judgment interest to the extent allowed by law; and

m) Grant other equitable or remedial relief as the Court deems appropriate.

Date: March 7, 2024

/s/Alexandra K. Piazza
Alexandra K. Piazza (No. 010922013)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (202) 559-9740
apiazza@bm.net

Shanon Carson (*pro hac vice*)
Olivia Lanctot (No. 415612023)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4620

scarson@bm.net
olanctot@bm.net

Eric Lechtzin (No. 011841992)
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record through the Court's ECF system on this 7th day of March, 2025.

By: *Is/* Alexandra K. Piazza
Alexandra K. Piazza