## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**KELLY GRINK, *et al.*,** *individually and on behalf of all others similarly situated,*

> *Plaintiffs,*

> v.

**VIRTUA HEALTH, INC., *et al.*,**

> *Defendants.*

No. 24-cv-09919

**OPINION**

---

**APPEARANCES:**

**Eric Lechtzin**
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newtown, PA 18940

**Olivia Lanctot**
**Natalie Lesser**
**Alexandra Koropey Piazza**
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103

> *On behalf of Plaintiffs*

**Edward D. Rogers**
**Elizabeth A. Lilly**
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

> *On behalf of Defendants Virtua Health, Inc.,*
> *Board of Directors of Virtua Health, Inc.,*
> *Finance and Investment Committee, and*
> *Virtua Defined Contribution Plans*
> *Retirement Sub-Committee*

**Sandra D. Grannum**
FAEGRE DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932

> *On behalf of Lincoln National Corporation,*
> *Lincoln Retirement Services Co., LLC, and*
> *Lincoln National Life Insurance Co.*

**O'HEARN, District Judge.**

## INTRODUCTION

This matter comes before the Court on a Motion to Dismiss filed by Defendants Virtua Health, Inc. ("Virtua"), Board of Directors of Virtua Health, Inc. ("Virtua Board"), Finance and Investment Committee ("Committee"), and Virtua Defined Contribution Plans Retirement Sub-Committee ("Sub-Committee") (collectively, the "Virtua Defendants"), (ECF No. 45), as well as a Motion to Dismiss filed by Defendants Lincoln National Corporation ("Lincoln"), Lincoln Retirement Services Company ("Lincoln Retirement"), and Lincoln National Life Insurance Company ("Lincoln National") (collectively, the "Lincoln Defendants"), (ECF No. 48). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons set forth below, the Virtua Defendants' Motion, (ECF No. 45), is **GRANTED IN PART** and **DENIED IN PART**, and the Lincoln Defendants' Motion, (ECF No. 48), is **GRANTED**.

## I.    BACKGROUND

Plaintiffs Kelly Grink, Diane Trump, and Steven Molnar ("Plaintiffs") are current or former participants in the Virtua Health 401(k) Plan or 403(b) Retirement Program (collectively, the "Plans"). (Am. Compl., ECF No. 39 at ¶¶ 1–2, 24–27). They bring this action on behalf of the Plans alleging claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for alleged fiduciary breaches and prohibited transactions by the Virtua Defendants and the Lincoln Defendants. (Am. Compl., ECF No. 39 at ¶¶ 28–39). The Class Period

here is alleged to begin October 18, 2018, and run through the date of judgment ("Class Period"). (*Id.* at ¶ 5 n.1).

### A. **The Plans and Their Investments**

Virtua established the 401(k) Plan as a defined-contribution, individual account plan for eligible Virtua employees. (*Id.* at ¶ 17). Between 2018 and 2023, the 401(k) Plan held between approximately $485 million and $1.1 billion in assets and had between 7,612 and 11,240 participants. (*Id.*). Virtua also established a 403(b) Retirement Program, a defined-contribution individual account plan. (*Id.* at ¶¶ 21–22). Plaintiffs allege that all fiduciary decisions relating to investments, service providers, and plan administration were made identically for both the 401(k) and 403(b) Plans because the Committee and Sub-Committee exercised authority over both. (*Id.* at ¶ 23). Plaintiffs' allegations of fiduciary breach are therefore asserted equally as to the 403(b) Program unless otherwise stated. (*See id.*).

Plaintiffs' claims are based upon a myriad of allegations related to the Plans' management and investment composition. First, Plaintiffs allege claims related to the Plans' use of the Lincoln Stable Value Account ("SVA") as the Plans' primary fixed-income investment throughout the Class Period. (*Id.* at ¶¶ 53–57). The SVA is a general account group annuity product offered pursuant to a Group Annuity Contract between Virtua and Lincoln National, effective on July 6, 2015. (*See* Virtua Defs.' Ex. 16, ECF No. 47-1 at 43). As a general account product, participant assets are held in Lincoln's general account which, according to Plaintiffs, unreasonably exposed their investments to Lincoln's credit risk. (Am. Compl., ECF No. 39 at ¶¶ 59–64). The SVA's structure also enabled the Lincoln Defendants to earn undisclosed "spread income" by crediting participants with interest rates substantially lower than the returns earned on other general account investments. (*Id.* at ¶¶ 63–64). The SVA's crediting rate remained around three percent, which

Plaintiffs contend lagged behind comparable separate-account or synthetic stable value products offered by others, such as the "MassMutual Separate Account Stable Value" and "TIAA Traditional Annuity." (*Id.* at ¶¶ 79–82). The Lincoln Defendants also received an annual revenue-sharing payment of 55 basis points on assets invested in the SVA, which totaled more than $4 million from 2018 to 2022.[1] (*Id.* at ¶¶ 67–72). All told, Plaintiffs assert that despite the Plans' size and corresponding negotiating leverage, the Plans' fiduciaries imprudently selected and retained the SVA without seeking alternatives such as "synthetic" annuity contracts, collective investment trusts ("CITs") for the 401(k) Plan, or other target-date funds ("TDF"). (*Id.* at ¶¶ 80–84, 106–116).

Second, Plaintiffs assert claims related to the use of higher-cost mutual fund share classes ("Share Class Claims"). (*Id.* at ¶¶ 85–90). Plaintiffs allege that the Plans regularly invested in higher-cost "retail" or "non-institutional" share classes even though the Plans' size qualified them for lower-cost "institutional" share classes of the same funds. (*Id.* at ¶¶ 87–90). Plaintiffs cite specific examples, including the First Eagle Global Fund Class I, Oakmark International Institutional Fund ("Oakmark"), and four Vanguard index funds. (*Id.* at ¶¶ 90–97). They allege that the Plans' size qualified them for lower-cost institutional shares in these funds which were

---

[1]  Plaintiffs assert that the Lincoln Defendants charged the Plans an additional 55 basis points on assets invested in the SVA and calculate annual administrative fees exceeding $2 million in certain years based on that premise. (*See* Am. Compl., ECF No. 39 at ¶¶ 206–09). The Virtua Defendants dispute this and cite the governing agreement to support their argument that Plaintiffs have inverted the contract terms: under the Third Restated Recordkeeping Service Agreement ("Recordkeeping Agreement"), the Lincoln Defendants' compensation consisted of a 16 basis point asset-based fee *minus* a 55 basis point offset tied to SVA assets, not the sum of those two figures. (*See* Virtua Defs.' Br., ECF No. 47 at 11, 26–28). For example, according to the Virtua Defendants' calculation, the Lincoln Defendants' 2020 administrative compensation was approximately $337,000, not the $2.48 million Plaintiffs allege. (Virtua Defs.' Reply Br., ECF No. 59 at 13–14). The Court need not resolve this factual dispute at this stage, but notes that the disagreement bears directly on Plaintiffs' excessive-fee theory.

available throughout the Class Period, yet the Plans' fiduciaries retained the higher-cost "retail" shares. (*Id.*).

Third, Plaintiffs assert claims of underperformance and excessive fees related to several actively managed funds ("Actively Managed Fund Claims"): the Oakmark, Goldman Sachs Small Cap Value ("Goldman SCV"), Metropolitan West Total Return Bond ("MetWest"), and American Funds Europacific Growth ("Europacific Growth") funds. (*Id.* at ¶¶ 141–95). For example, Plaintiffs assert that Oakmark's 0.81% expense ratio was unreasonably high and that the fund consistently underperformed when compared to its benchmark index and peer funds across one-, three-, five-, and ten-year periods. (*Id.* at ¶¶ 158–160). Plaintiffs make similar allegations with respect to the Goldman SCV, MetWest, and Europacific Growth funds. (*See id.* at ¶¶ 122–135, 141–50, 177–95).

Fourth, Plaintiffs allege that the Committee and Sub-Committee failed to have adequate monitoring processes and failed to evaluate investments pursuant to the criteria set forth in the Plans' Investment Policy Statement ("IPS"), including performance relative to peers, risk metrics, style consistency, and expense ratios. (*Id.* at ¶¶ 117–22).

Fifth, Plaintiffs allege that the Plans' TDF investment option, the LifeSpan Models, underperformed and incorporated imprudent underlying funds, including the Europacific Growth and MetWest funds. (*Id.* at ¶¶ 122–52, 182–84). Overall, Plaintiffs allege that the 2019 LifeSpan Models performed 5.02 percent worse than "the average TDF's mutual fund" and the 2025 LifeSpan Model similarly lagged behind its "peer average" as well as major target-date providers, including "American Funds 2025 Trgt. Date Retire R6," "T. Rowe Price Retirement 2025," and "Vanguard Target Retirement 2025 Inv." (*Id.* at ¶¶ 138–40, 192–93).

Finally, Plaintiffs allege that as a result of the failure of the Virtua Defendants to monitor and reasonably control recordkeeping and administrative fees paid to Lincoln, the Lincoln Defendants received excessive fees. (*Id.* at ¶¶ 196–215). The Lincoln Defendants' compensation structure for services related to the Plans is detailed in the Recordkeeping Agreement. (*See* Defs.' Ex. 15, ECF No. 47-1 at 10). Plaintiffs assert that a reasonable recordkeeping fee for a plan of comparable size would approximate $35 per participant per year, yet Lincoln allegedly received between $102 and $168 per participant annually in direct and asset-based compensation from 2018 through 2022. (Am. Compl., ECF No. 39 at ¶¶ 204–12). When combined with revenue sharing from the SVA, Plaintiffs allege that Lincoln received more than $11.7 million over five years, excluding additional income earned on float retained in Lincoln's clearing account. (*Id.* at ¶¶ 209–14).

## B.  <u>The Virtua Defendants</u>

Virtua is the Plans' sponsor, administrator, and a "named fiduciary" as defined by ERISA. (*Id.* at ¶¶ 29–30). Plaintiffs assert that Virtua exercised discretionary authority over the Plans' management, including the selection and monitoring of investment options, service providers, and service provider fees. (*Id.* at ¶¶ 30, 40).

Plaintiffs allege that the Virtua Board appointed, oversaw, and monitored the Committee and Sub-Committee, and thereby exercised fiduciary authority with respect to the composition and supervision of those two fiduciaries. (*Id.* at ¶¶ 31–32). Plaintiffs further allege that, because the Board appointed the Committee and Sub-Committee fiduciaries responsible for managing Plan assets, it also bore a corresponding duty to monitor those appointees' performance and remedy any deficiencies in their oversight. (*Id.* at ¶ 32).

The Committee served as a named fiduciary and the Plans' administrator, with direct responsibility for discretionary decisions relating to investment selection, investment monitoring, recordkeeping arrangements, and the oversight of professional advisers. (*Id.* at ¶ 33). Plaintiffs assert that the Committee was charged with adopting rules and procedures for administering the Plans, maintaining Plan records, communicating required information to participants, filing annual reports with government agencies, determining participant eligibility, and appointing investment managers. (*Id.*). Plaintiffs further allege that the Committee monitored fund performance, controlled administrative expenses, and had authority over the selection and removal of investment options. (*Id.*).

The Sub-Committee similarly was appointed by the Board and had shared responsibility for making fiduciary decisions regarding the Plans' management. (*Id.* at ¶ 34). Plaintiffs allege that the Sub-Committee exercised discretionary control over investment-related decisions, including the retention and monitoring of investment options and the review of adviser recommendations, in coordination with or on behalf of the Committee. (*See id.*).

### C.  **The Lincoln Defendants**

Lincoln is the Plans' trustee responsible for holding the Plans' assets in trust and, in that capacity, Lincoln exercised authority over the Plans' assets, particularly those invested in the SVA. (*Id.* at ¶¶ 36, 39).

Lincoln Retirement served as the Plans' recordkeeper throughout the Class Period. (*Id.* at ¶ 37). As recordkeeper, Lincoln Retirement performed administrative functions for which it allegedly received both direct per-participant fees and asset-based compensation. (*See id.* at ¶¶ 37, 199–212).

Lincoln National issued and managed the SVA through the Group Annuity Contract. (*Id.* at ¶¶ 38, 63). Plaintiffs assert that "Lincoln and/or Lincoln National" set the SVA's crediting rates, invested participant assets in its general account, and earned both spread income and revenue-sharing payments from those assets. (*Id.* at ¶¶ 63–82, 208–214).

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint on October 18, 2024, (ECF No. 1), and later the operative Amended Complaint on March 7, 2025. (ECF No. 39). The Virtua Defendants and Lincoln Defendants both moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint on April 4, 2025. (ECF Nos. 45, 48).

Count I alleges violations of ERISA fiduciary duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A) and (B) against the Virtua Defendants. Count II alleges a breach of the duty of loyalty under 29 U.S.C. § 1104(a)(1)(A)(ii) against Virtua and the Virtua Board. Count III alleges a prohibited transaction claim under 29 U.S.C. § 1106(a)(1)(C) against Virtua, the Committee, and the Sub-Committee, with the Lincoln Defendants as parties in interest. Count IV alleges a prohibited transaction claim under 29 U.S.C. § 1106(a)(1)(C) against the Lincoln Defendants, with Virtua and the Committee as parties in interest. Finally, Count V alleges a prohibited transaction claim under 29 U.S.C. § 1106(b) against Virtua, the Committee, and the Sub-Committee, with UBS/Morgan Stanley as a party in interest.

## III.    JURISDICTION

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, as the claims arise under federal law, namely, 29 U.S.C. § 1332(e) (ERISA civil enforcement actions).

## IV.    **LEGAL STANDARD**

To state a claim, a complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Although "short and plain," this statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (cleaned up). Rather, a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Id.* at 570.

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept the complaint's well-pleaded allegations and all reasonable inferences drawn from them as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). Through this lens, the court then conducts a three-step analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Next, the court should identify and disregard those allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Malleus*, 641 F.3d at 563 (quoting *Iqbal*, 556 U.S. at 679). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). At the motion-to-dismiss stage, the facts are limited to the allegations in the complaint. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016). Courts accept the factual allegations as true and view them in the light most favorable to the plaintiff. *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022). Courts may also "consider documents integral to or explicitly relied upon in the complaint or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prods.*, 822 F.3d at 133 n.7 (internal quotation marks, citations, and emphasis omitted). *See also Steinhardt Grp. Inc. v. Citicorp*, 126 F.3d 144, 145 & n.1 (3d Cir. 1997) (considering contracts underlying the complaint, which were attached to the motion to dismiss). If any other matters outside the pleadings are presented and the court does not exclude them, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. FED. R. CIV. P. 12(d).

## V.    DISCUSSION

Both the Lincoln Defendants and the Virtua Defendants move to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim. (ECF Nos. 45, 48). The Court will address each Motion in turn.

### A.  Lincoln Defendants' Motion

The claims against the Lincoln Defendants are limited to Counts III and IV, which allege prohibited transaction claims, (Am. Compl., ECF No. 39 at ¶¶ 252–63), based on the same underlying alleged prohibited transactions: the "annuity transactions," (*id.* at ¶¶ 255, 261). The difference lies in the role alleged to have been played by the Lincoln Defendants: Count III alleges the Lincoln Defendants are liable for the transaction as a "party in interest," whereas Count IV

alleges the Lincoln Defendants are liable for the same transaction as an ERISA fiduciary. (*Id.* at ¶¶ 257, 260–61). The Lincoln Defendants argue that Plaintiffs' claims fail to state a claim because they are not fiduciaries for purposes of the alleged prohibited transactions, nor otherwise liable as parties in interest. (Lincoln Defs.' Br., ECF No. 48-1 at 12–18). Plaintiffs argue the opposite; that the Lincoln Defendants were fiduciaries with respect to the SVA "[b]y exercising discretionary control over the Plans' assets involved in the Lincoln SV[A]" or are otherwise liable as co-fiduciaries to the Virtua Defendants' alleged fiduciary breaches. (*See* Pls.' Br., ECF No. 56 at 11, 17).

With respect to prohibited transactions, ERISA Section 406 prohibits a "fiduciary with respect to a plan" from directly or indirectly "caus[ing] the plan to engage" in certain transactions with "a party in interest." 29 U.S.C. § 1106(a)(1)(A)–(D). ERISA defines a "fiduciary" as follows:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A). Applying the plain language of Section 406, Count III fails to state a claim as to the Lincoln Defendants. Section 406 only prohibits plan *fiduciaries* from causing the plan to engage in one of ERISA's enumerated prohibited transactions. *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 82 (3d Cir. 2012). "Plaintiffs cannot sustain a prohibited transaction claim . . . 'without establishing that [d]efendants were fiduciaries with respect to the' challenged conduct." *Miller v. Brozen*, No. 23-2540, 2024 WL 4024363 at *13 (D.N.J. Aug. 30, 2024) (quoting *Danza v. Fidelity Mgmt. Trust Co.*, No. 11-2893, 2012 WL 3599362 at *3 (D.N.J. Aug. 20, 2012), *aff'd*, 533 F. App'x 120 (3d Cir. 2013)). Accordingly, liability for prohibited transactions extends

only to the "fiduciary" who "cause[s]" a plan to engage in a prohibited transaction. 29 U.S.C. § 1106(a)(1). *See also Harris Tr. & Sav. Bank v. Saloman Smith Barney, Inc.*, 530 U.S. 238, 244 (2000) (stating that ERISA governs "only the conduct of fiduciaries, not of counterparties or other nonfiduciaries"). Yet Count III only alleges the Lincoln Defendants are liable as parties in interest to the "annuity transactions," and nothing else. As such, Count III fails to state a claim against the Lincoln Defendants as a matter of law.

Count IV fails to state a claim for different reasons. Count IV alleges the Lincoln Defendants were fiduciaries to the prohibited "annuity transactions." (Am. Compl., ECF No. 39 at ¶¶ 260–61). As a preliminary matter, it is not particularly clear what specific transactions Plaintiffs allege violated Section 406. The Parties seem to concur that "annuity transactions" refers to the establishment of the SVA via the Group Annuity Contract executed between Virtua and Lincoln National.[2] (*See* Pls.' Br., ECF No. 56 at 15 n.5 (arguing that "the Lincoln Defendants were acting in a discretionary function with respect to the offering of the group annuity contracts and the SV[A] as well as the compensation they received through the SV[A]."); Lincoln Defs.' Br., ECF No. 48-1 at 14–15 (discussing the "annuity transactions" as related to the Group Annuity Contract); Virtua Defs.' Br., ECF No. 47 at 30 (stating the "annuity transactions . . . presumably [is] related to the SV[A]")). Thus, the Court will similarly interpret Plaintiffs' allegations for purposes of the Lincoln Defendants' Motion.

---

[2] Construing the "annuity transactions" as such, it is unclear whether *any* of the prohibited transaction claims (Counts III–IV) state a claim. The Group Annuity Contract was executed on July 6, 2015; this case's relevant limitations period begins October 18, 2018. *See* 29 U.S.C. § 1113(1)(A) (ERISA six-year statute of limitations); (Compl., ECF No. 1 (filed October 24, 2024)). Because neither the Lincoln Defendants nor the Virtua Defendants advance this argument, and the Virtua Defendants concede Count III states a claim for this same "annuity transaction[]," (Virtua Defs.' Reply Br., ECF No. 59 at 17), the Court will nevertheless address all alleged prohibited transaction claims.

While the pleadings must "be parsed very carefully to understand what acts . . . are alleged to be fiduciary in nature," *Pegram v. Herdrich*, 530 U.S. 211, 227 (2000), the Amended Complaint contains no more than conclusory allegations as to the Lincoln Defendants' fiduciary status related to the execution of the Group Annuity Contract.[3] Courts have routinely rejected similar claims because, when entering into an arm's length agreement with a plan, the annuity provider "owe[s] no fiduciary duty to plan participants[.]"[4] *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) ("Principal owed no duty to plan participants during its arm's-length negotiations with" the annuity provider company). *See also Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 297 (3d Cir. 2014) (affirming dismissal of claims related to the sale of annuities to an ERISA plan). Thus, as the annuity provider, the Lincoln Defendants owed no duty to Plaintiffs related to Virtua's decision to enter the Group Annuity Contract with Lincoln National.

Therefore, both Counts III and IV fail to state a claim against the Lincoln Defendants, their Motion to Dismiss is granted, and Counts III and IV are dismissed without prejudice.

---

[3] Taking an expansive view of the Plaintiffs' allegations related to the "annuity transactions" does not save Count IV. If construed to consider post-Group Annuity Contract allegations that the "investment funds" turned over to "Lincoln and/or Lincoln National" discretionary control over Plan assets, Plaintiffs do not otherwise allege a specific transaction that violated ERISA once any of the Lincoln Defendants had such control. (Am. Compl., ECF No. 39 at 63–64). In fact, many of the paragraphs in the Amended Complaint to which Plaintiffs point, (*see* Pls.' Br., ECF No. 56 at 13), have nothing to do with the Lincoln Defendants at all, let alone any particular transaction involving the same.

[4] None of the Lincoln Defendants are adequately plead as co-fiduciaries, *see* 29 U.S.C. § 1009(a), because there are no allegations that the Lincoln Defendants "had knowledge of" the Virtua Defendants' (to the extent any of them are fiduciaries) "allegedly flawed decision-making process regarding investment options[.]" *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011).

### B.  **Virtua Defendants' Motion**

The Virtua Defendants move to dismiss the Amended Complaint in its entirety on the grounds that, among other things, the Amended Complaint fails to state any plausible ERISA claim because Plaintiffs do not allege Virtua and/or the Virtua Board were fiduciaries as to any of the conduct complained of, (Virtua Defs.' Br., ECF No. 47 at 33–34), and, in any event, the Amended Complaint fails to directly or circumstantially allege a flawed fiduciary process. (*See id.* at 14–25, 28–31). The Court will first consider whether Virtua and the Virtua Board are fiduciaries and then turn to the substantive allegations.

### 1.  The Amended Complaint Fails to State a Claim Against the Virtua Board Because It Was Not a Fiduciary to the Plans and Only Counts III and IV State a Claim Against Virtua as a Fiduciary

ERISA confers liability upon "[a]ny person who is a fiduciary with respect to a plan who breaches" any of ERISA's substantive provisions. 29 U.S.C. § 1109(a). *See also id.* § 1105 (liability for breach of co-fiduciary). Absent being designated a "named fiduciary," 29 U.S.C. § 1102(a)(1), a person is only a fiduciary "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.* § 1002(21)(A). Thus, "the threshold question [to determine liability] is . . . whether that person was acting as a fiduciary . . . *when taking the action subject to complaint*." *Pegram*, 530 U.S. at 226 (emphasis added).

Here, despite Plaintiffs' allegations otherwise, (*see* Am. Compl., ECF No. 39 at ¶ 30), the documents relied upon by Plaintiffs confirm Virtua is not a named fiduciary of the Plans.[5] *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (holding that when

---

[5] No similar allegations are made against the Virtua Board.

the documents relied upon "contradict [the] allegations in the complaint," the documents "control"). The 401(k) Plan Agreement expressly designates "the Trustee, and the Committee" as named fiduciaries. (Virtua Defs.' Ex. 2, ECF No. 45-2 at 45 § 2.31). The identity of the Committee as referenced is self-evident, but Plaintiffs make no allegation in the Amended Complaint as to Virtua or the Virtua Board acting as a "Trustee" under the Plan Agreement, nor do they otherwise allege that such Trustee, as a named fiduciary, breached any of ERISA's substantive provisions.[6] The only other allegation as to Virtua is that it is a plan sponsor. But it is well settled that "plan sponsorship by itself does not create a fiduciary status, because it is merely a corporate or settlor function." *In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434, 447 (D. Md. 2005). *See also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 367 (2d Cir. 2014) ("In defining the scope of a fiduciary's duty under ERISA, courts have distinguished between fiduciary functions, which give rise to ERISA liability, and 'settlor' functions, which are akin to actions taken by the settlor of a trust and do not trigger ERISA liability."). Thus, neither Virtua or the Virtua Board are named fiduciaries.

Nevertheless, Virtua and the Virtua Board can functionally be fiduciaries "to the extent" they exercise the discretion or control over the selection, retention, and monitoring of the investments and recordkeeping expenses. 29 U.S.C. § 1002(21)(a). But there are no allegations that either are fiduciaries with respect to several of the particular "action[s] subject to complaint." *Pegram*, 530 U.S. at 226. Count I complains of unwise or improper investments, and Count II alleges a failure to monitor excessive fees paid to the Lincoln Defendants. (*See* Am. Compl., ECF No. 39 at ¶¶ 240–51). But it is the Committee and Sub-Committee who are allegedly "directly

---

[6] The Amended Complaint alleges that Lincoln "is the Trustee of the Plans (acting through its Lincoln Financial Group Trust Company)." (ECF No. 39 at ¶ 36). No similar allegation, nor anything discernable from the documents relied on by Plaintiffs, confer such status on Virtua or the Virtua Board.

responsible" for the Plans' investments and administrative expenses—not Virtua or the Virtua Board. (*See id.* at ¶¶ 33–34).

Turning to Counts III and V,[7] Plaintiffs allege that Virtua and the Virtua Board were fiduciaries for purposes of the alleged prohibited "annuity transactions." (*See id.* at ¶¶ 252–73). With respect to Virtua, the only alleged discretionary action taken appears to be its contracting with "Lincoln and/or Lincoln National" to provide the SVA. (*See id.* at ¶¶ 63–66). As to this "annuity transaction[]," Virtua is thus sufficiently plead as a fiduciary. But there are no other allegations in the Amended Complaint that Virtua exercised discretion and/or control as to any of the complained of conduct including that related to the Plans' investments or fees paid to the Lincoln Defendants. As such, only Counts III and V state a claim as to Virtua as a fiduciary as related to the "annuity transactions."

As to the Virtua Board, the Amended Complaint alleges that they "exercised discretionary authority to appoint and monitor the [the Committee and Sub-Committee as the Plans' fiduciaries] who had control over the Plans' management and/or authority or control over management or disposition of the Plans' assets." (*Id.* at ¶ 31). But "[s]imply because they had the power to appoint and remove members of [the Committee and Sub-Committee] is not enough to plead, as the Plaintiffs attempt to in their Complaint, that they exercised the required control over the management of assets in the Plan." *In re RCN Litig.*, No. 04-5068, 2006 WL 753149, at *8 (D.N.J. Mar. 21, 2006). Instead, "if an employer and its board of directors have no power with respect to

---

[7] Count IV appears to be directed solely at the Lincoln Defendants, with Virtua and the Committee as parties in interest. (Am. Compl., ECF No. 39 at ¶¶ 259–263). To the extent it is construed to allege claims against Virtua and the Committee, it fails because "Plaintiffs cannot sustain a prohibited transaction claim . . . without establishing that [d]efendants were fiduciaries with respect to" the annuity transactions subject to Count IV. *Miller*, 2024 WL 4024363 at *13 (citations omitted).

16

a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions." *Id.* at *7. Beyond that, to state a claim for breach of fiduciary duty arising out of the Plans' assets, Plaintiffs would "need to allege that these defendants, either through the use of their positions or otherwise, caused the [Committee or Sub-Committee] to relinquish their independent discretion in" performing the conduct at issue. *Id.* at *8. Here, there are no such allegations as to the Virtua Board. Indeed, the Amended Complaint alleges that only the Committee and Sub-Committee "were and are directly responsible for making fiduciary decisions regarding the management of the Plans . . . ." (ECF No. 39 at ¶¶ 33–34). There are no allegations that the Committee or Sub-Committee was encumbered in any way by the Virtua Board or that the Board otherwise had any oversight function.[8] Thus, the Virtua Board is not a fiduciary for purposes of the conduct underlying any of the Counts in the Amended Complaint.

In sum, the Amended Complaint sufficiently alleges that Virtua was a fiduciary as to the conduct underlying Counts III and V. As to Virtua Board, the Amended Complaint fails to allege they were a fiduciary to anything.[9] Because Virtua and the Virtua Board are the only defendants named in Count II, the Virtua Defendants' Motion as to that claim is granted without prejudice. The Court will now evaluate the remaining claims in turn.

---

[8] Plaintiffs allege that all Virtua Defendants "and each of their respective members during the Class Period, were and/or are fiduciaries to the Plans." (*See* Am. Compl., ECF No. 39 at ¶ 35). This vague allegation is not supported by any plausible facts and is thus conclusory and insufficient. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997) (noting the Court need not "credit a [C]omplaint's 'bald assertions' or 'legal conclusions.'" (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir. 1996))).

[9] Nonetheless, as discussed below, Count V fails to state a claim because it does not sufficiently allege a prohibited transaction between Virtua, the Committee, and the Sub-Committee.

### 2.  Breach of Fiduciary Duty (Count I)

Count I alleges breach of both the duty of loyalty, 29 U.S.C. § 1104(a)(1)(A), and duty of prudence, *id.* § 1104(a)(1)(B), against the Virtua Defendants. To state a claim for breach of fiduciary duty under ERISA, a plaintiff must plausibly allege that "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (quoting *Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019)).

In assessing the pleading, the Court must take a holistic approach to the allegations viewed under the totality of the circumstances. *Sweda*, 923 F.3d at 331. Plaintiffs are not required at the pleading stage to rule out all lawful explanations for fiduciary conduct, nor to allege direct evidence—facts often unavailable before discovery. *Id.* at 332–33. So long as there is "substantial circumstantial evidence" such that the court can "reasonably infer that a breach had occurred," the pleading will survive a motion to dismiss. *Id.* at 333.

#### a.  Plaintiffs Fail to State a Claim for Breach of the Duty of Loyalty

The duty of loyalty requires a fiduciary to act for "the exclusive purpose of" providing benefits to participants and beneficiaries and "defraying reasonable expenses" related to plan administration. 29 U.S.C. § 1104(a)(1)(A). Fiduciaries must act "with an eye single" to the interests of participants and beneficiaries. *McGowan v. Barnabas Health, Inc.*, No. 20-13119, 2021 WL 1399870, at *7 (D.N.J. Apr. 13, 2021) (quoting *Pegram*, 530 U.S. at 235). "To plead a loyalty claim, courts look for allegations suggesting that the fiduciary made decisions benefitting itself or a third party." *Id.* But mere conclusory allegations of failing to act for the exclusive purpose of providing benefits or defraying reasonable costs does not suffice. *McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492, 2023 WL 2728787, at *16 (D.N.J. Mar. 31, 2023) (quoting *Sacerdote v. N.Y. Univ.*, No. 16-6284, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017), *rev'd in part on other*

18

*grounds*, 9 F.4th 95 (2d Cir. 2021)). Rather, "to implicate the concept of 'loyalty,' a plaintiff must allege plausible facts supporting an inference that the defendant acted *for the purpose* of providing benefits to itself or someone else." *Id.* (emphasis in original).

Here, Plaintiffs argue the "Virtua Defendants permitted the Lincoln Defendants to reap excessive compensation through recordkeeping fees, revenue sharing, spread income, and earnings on float" thus breaching the duty of loyalty. (Pls.' Br., ECF No. 55 at 35 (citing Am. Compl., ECF No. 39 at ¶¶ 208–14); (*see also* Am. Compl., ECF No. 39 at ¶¶ 216–223). These allegations also serve as the basis for the claims against Virtua and the Virtua Board in Count II under 29 U.S.C. § 1104(a)(1)(A)(ii). (Am. Compl., ECF No. 39 at ¶¶ 247–251). As discussed above, Count II fails to state a claim as to Virtua and the Virtua Board because they are not fiduciaries as to the conduct underlying Count II. Plaintiffs' claims for excessive fees under Count I fail for the same reasons. Thus, the Court's analysis is limited to whether the Amended Complaint states a claim as to the Committee and Sub-Committee for a breach of the duty of loyalty based on excessive fees.

Limited to the Committee and Sub-Committee and for the reasons previously set forth, the Virtua Defendants argue that the Amended Complaint fails to state a claim because there are no allegations that the Committee or Sub-Committee acted improperly to benefit themselves or any third parties. (Virtua Defs.' Br., ECF No. 47 at 25–26). The Court agrees. The most that can be gleaned from the Amended Complaint is that it sets forth the elements and reasoning behind § 1104(a)(1)(A) claims. (*See* ECF No. 39 at ¶¶ 216–23). It is axiomatic that such conclusory allegations are insufficient to state a claim. *See Piscopo v. Pub. Serv. Elec. & Gas Co.*, 650 F. App'x 106, 109–110 (3d Cir. 2016) (affirming dismissal of ERISA claims where the plaintiff "simply alleges the elements" of the statute). The Amended Complaint is devoid of any factual

allegations, or even an insinuation that the Committee or Sub-Committee took the complained of actions for the benefit of the Lincoln Defendants, or a third-party.

Rather, Plaintiffs' alleged breach of the duty of loyalty appears to flow from their allegations of imprudent conduct. As such, the Amended Complaint fails to state a claim for the breach of the duty of loyalty. *See Silva v. Evonik Corp.*, No. 20-2202, 2020 WL 12574912, at *8 (D.N.J. Dec. 30, 2020) ("[A] plaintiff may not simply 'recast' a claim of imprudence as an independent claim of disloyalty without additional facts suggesting an improper motive or financial benefit."). The Virtua Defendants' Motion is therefore granted, without prejudice, as to the Count I under 29 U.S.C. § 1104(a)(1)(A).

### b. Plaintiffs Adequately Allege a Breach of the Duty of Prudence Based on the Share Class Claims and Some of the Actively Managed Fund Claims

The duty of prudence obligates ERISA fiduciaries to act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). This standard is objective, focusing not on investment results but on process—that is, whether the facts, assessed holistically, permit a reasonable inference that a fiduciary's decision-making process was deficient. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). That process must be judged "under the circumstances then prevailing," not in hindsight. *Mator*, 102 F.4th at 184. Allegations that "collectively support a plausible inference" that defendants acted imprudently suffice. *Sweda*, 923 F.3d at 333. As noted, direct allegations of imprudence are not necessary, *id.* at 332–33, but assertions of imprudence based on allegations of investment underperformance must "provide a sound basis for comparison—a meaningful benchmark—to show a prudent fiduciary in like circumstances would have selected a different fund [or course of action]." *Silva*, 2020 WL 12574912, at *5 (quotations omitted). Benchmarks must be "specific" and "sufficiently similar to

render the comparisons valid." *Mator*, 102 F.4th at 188; *see also Cho v. Prudential Ins. Co. of Am.*, No. 19-19886, 2021 WL 4438186, at *8 n.7 (D.N.J. Sept. 27, 2021) ("Comparing apples and oranges is not a way to show" a meaningful benchmark such "that one [investment] is better or worse than the other.").

Here, Plaintiffs allege the Virtua Defendants breached the duty of prudence by failing to follow the IPS in making investment decisions; imprudently selecting and monitoring the SVA; imprudently retaining the LifeSpan Models and certain of its underlying investments; imprudently retaining certain actively managed funds as Plan investments; and imprudently retaining high-cost share classes of certain funds when lower-cost share classes were available.[10] (Am. Compl., ECF No. 39 at ¶ 243). The Court finds that Plaintiffs state a claim for breach of the duty of prudence only as to the Actively Managed Fund and Share Class Claims.

### i.    Failure to Follow the IPS

Plaintiffs allege that the Virtua Defendants acted imprudently based on their failure to follow the IPS. (*See* Am. Compl., ECF No. 39 at ¶¶ 151, 163). A fiduciary's failure to discharge their duties "in accordance with the documents and instruments governing the plan" is a cognizable claim under 29 U.S.C. § 1104(a)(1)(D). But here, Count I of the Amended Complaint is plead as a violation of the broader fiduciary duty imposed by 29 U.S.C. § 1104(a)(1)(A) and (B), and not the subsection directly related to a plan's governing documents. (*See* ECF No. 39 at ¶ 241). While

---

[10]    Although Plaintiffs purport to set forth the factual basis for this claim by stating "[s]pecifically, among other failings," (Am. Compl., ECF No. 39 at ¶ 243), the factual basis is less than clear. The introductory language in paragraph 243 of the Amended Complaint is internally inconsistent, does not clearly enumerate the theories on which Plaintiffs rely, and makes it difficult to discern the parameters of the claim. Nevertheless, because the pleading elsewhere hints at the additional theories argued in the parties' briefs at length—namely, the failure to follow the IPS and underperformance allegations—the Court construes the Amended Complaint liberally and considers them within the purview of Plaintiffs' "among other failings" allegations.

contravention of an IPS can be "evidence of imprudent action" under this broader duty, *Dardaganis v. Grace Cap.*, 889 F.2d 1237, 1241 (2d Cir. 1989), such allegations must sufficiently allege an enforceable provision of the IPS was breached, *see Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 637 (D.N.J. 2010) (holding that, under § 1104(a)(1)(D), plaintiffs adequately alleged a violation of an IPS where the IPS mandated "Specific Asset Allocation" and contained a "restricted investment" provision); *see also Snyder v. UnitedHealth Grp., Inc.*, No. 21-1049, 2024 WL 1076515, at *11–12 (D. Minn. Mar. 12, 2024) (finding that "many parts [of an IPS] are not binding" and that a § 1104(a)(1)(D) claim failed at summary judgment because plaintiffs could not show defendant "breach[ed] any enforceable provision" of the IPS). Here, the Amended Complaint fails to do so.

Aside from the IPS being generally "for guidance purposes only," Plaintiffs point to no specific enforceable provision and allege no specific violation of the IPS. The Amended Complaint itself describes the overall nonbinding nature of the IPS; indeed, Plaintiffs allege it merely "guide[s]" the Virtua Defendants, such that they "should focus on key areas for their investment selections and retentions" and "review and consider" certain criteria when evaluating the Plans' investments. (Am. Compl., ECF No. 39 at ¶¶ 117–118).

Further, to the extent a failure to follow the IPS could be circumstantial evidence of imprudence, the allegations in the Amended Complaint taken together do not suggest impropriety. The only allegations that the Virtua Defendants acted contrary to these "guidelines" are based on after-the-fact evaluation of underperforming assets that are dependent upon comparison to other investment opportunities. (*See id.* at ¶¶ 119–35, 144–52). For instance, Plaintiffs allege "[e]vidence from the certified reporting to the U.S. Department of Treasury and Labor . . . indicates the Committee's selections and actions over a long period of time [were contrary to] the IPS and any

prudent process in selecting investments, funds and their related managers." (*Id.* at ¶ 119). This comparison leads Plaintiffs to allege that the failure to follow the IPS is further evidenced by the fact that, when compared to outside investment data, somehow, "90% of the Committee's selection from 2007 to 2018 didn't conform with their IPS and over 80% from 2019 to 2022." (*Id.* at ¶ 120). To the extent these allegations are even within the appropriate Class Period, they are merely conclusory and do not plausibly allege that the Virtua Defendants failed to follow any particular IPS mandate.

In short, the Amended Complaint fails to plausibly allege imprudence based on the IPS.

### ii.    Stable Value Account

Plaintiffs allege that the Virtua Defendants "failed to prudently select and monitor" the SVA. (*Id.* at ¶ 243). First, Plaintiffs allege it was inherently imprudent to select the SVA given the risk of it's single-entity credit structure and availability of less-risky investments, such as "synthetic" stable value accounts and other available TDFs. (*Id.* at ¶¶ 59–64, 73–77). Second, in light of this risk structure, it was imprudent to retain the SVA when it consistently underperformed compared to peer or more suitable investments. (*Id.* at ¶¶ 78–84). Lastly, Plaintiffs allege the fees related to the SVA that were paid to the Lincoln Defendants were excessive and contributed to the SVA's overall underperformance, and it was imprudent to retain the SVA when other investments— namely, "synthetic" stable funds, TDFs, or CITs—were available during the Class Period. (*See id.* at ¶¶ 62, 76–77).

The Court must first consider the relevant statutory period, as it sweeps away much of Plaintiffs' allegations related to the SVA. ERISA claims are subject to a six-year statute of limitations from "the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1)(A). October 18, 2018, marks six years prior to the filing of this lawsuit. (*See*

Compl., ECF No. 1). The Group Annuity Contract became effective July 6, 2015.[11] (Virtua Defs.' Ex. 16, ECF No. 47-1 at 43). Thus, the initial *selection* of the SVA falls clearly outside the statutory period and cannot support a claim.

Nevertheless, fiduciaries have a continuing duty to remove imprudent investments. *See Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."). Here, Plaintiffs allege that the Virtua Defendants' actions in retaining the SVA was imprudent based on comparison to peers. (Am. Compl., ECF No. 39 at ¶¶ 78–84). The Virtua Defendants argue these allegations are insufficient to state a claim because Plaintiffs have not alleged adequate comparators such that the Court can reasonably infer imprudent conduct. (Virtua Defs.' Br., ECF No. 47 at 19–20).

To be clear, bare "[a]llegations of underperformance, without more, do not suffice" to adequately plead imprudence. *Fumich v. Novo Nordisk Inc.*, No. 24-9158, 2025 WL 2399134, at *5 (D.N.J. Aug. 19, 2025) (citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022)). Thus, courts typically look to whether a plaintiff has alleged "meaningful benchmarks" such that underperformance gives rise, when compared to those benchmarks, to an inference of imprudence. *Silva*, 2020 WL 12574912, at *5. Benchmarks must be specific and sufficiently similar to render the comparisons meaningful. *Mator*, 102 F.4th at 188; *Cho*, 2021 WL 4438186, at *8.

---

[11] The Recordkeeping Agreement, which set the prevailing crediting rates the Lincoln Defendants were to receive related to their management of the Plans/SVA, was executed on July 1, 2017—also outside the limitations period. (Am. Compl., ECF No. 39 at ¶ 70; Defs.' Ex. 15, ECF No. 47-1 at 10).

Here, Plaintiffs fail to allege meaningful benchmarks to support their imprudence claims related to the SVA. Plaintiffs provide a chart comparing the crediting rates of the SVA to that of two allegedly "less risky" and "better performing" investments that they allege are, without factual support, "substantially identical" investments—the MassMutual Separate Stable Value and TIAA Traditional Annuity. (Am. Compl., ECF No. 39 at ¶¶ 79, 82). But nothing about these alleged comparators support an allegation that the SVA underperformed. *See Cho*, 2021 WL 4438186, at *8–9 (finding unsupported allegations that "peer funds" have a "similar investment style" do not "constitute a meaningful benchmark and [are] insufficient to plausibly allege . . . impruden[ce]."); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1147 (N.D. Cal. 2022) ("[L]abeling funds as 'comparable' or as a 'peer' is insufficient to establish that comparator funds are meaningful benchmarks against which to compare a challenged fund['s] performance."). Put differently, the chart is merely a comparison of each investments' crediting rate and fails to substantively show how the investments performed overall. And the crediting rate represented in the chart is belied by the Group Annuity Contract. (*See* Virtua Defs.' Ex. 16, ECF No. 47-1 at 43 (stating the investment returns are based on the *greater* of either the crediting rate or the "portfolio" rate)).

Plaintiffs' allegations related to the fees and spread income the Lincoln Defendants received related to the SVA suffer from the same deficiencies. Plaintiffs merely provide a list of the revenues Lincoln received during the Class Period. (*See* Am. Compl., ECF No. 39 at ¶¶ 67–72). The fund allegedly paid Lincoln 55 basis points in revenue-sharing annually—amounting to more than $4.19 million during the five years cited—on top of undisclosed spread income. (*Id.*). But these bare numbers, without more, do not raise an inference of imprudence. *See McCaffree*, 2023 WL 2728787, at *14 ("A high fee alone does not mandate a conclusion that recordkeeping

fees are excessive; rather, fees must be evaluated 'relative to the services rendered.'" (quoting *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021))); *Seibert v. Nokia of Am. Corp.*, No. 21-20478, 2023 WL 5035026, at *6 (D.N.J. Aug. 8, 2023) (noting that meaningful benchmarks must show that the fees paid were "higher than those paid by similar plans for the same services."); *Mator*, 102 F.4th at 188 (noting plaintiffs must account for differences in the services purchased to state a claim).

Nor do any of the other allegations related to retention of the SVA while "synthetic" stable funds, TDFs, or CITs were available raise an inference of imprudence. (*See id.* at ¶¶ 62, 76–77). The allegations that the SVA should have been replaced with any of these alternate investments, (*see id.* at ¶¶ 76–77), amount to nothing more than hindsight, which is insufficient to plausibly allege imprudence. *See Cho*, 2021 WL 4438186, at *8 ("Not only is hindsight 20/20, but it also does not meet the plausibility requirement."). Plaintiffs make no other plausible allegations that could raise an inference of imprudence here.

### iii.    LifeSpan Models

The LifeSpan Models allegations similarly fail, albeit for a different reason, as the Virtua Defendants point out, they are not fiduciaries to the LifeSpan Models. (*See* Virtua Defs.' Br., ECF No. 47 at 21–22 n.5).

The Recordkeeping Agreement provides that the Virtua Defendants had no discretionary authority to develop, monitor, and make changes to the LifeSpan Model portfolio. (*See* Virtua Defs.' Ex. 15, ECF No. 47-1 at 12–13 § § 1.4–1.5). Rather, that Agreement designates Morningstar Investment Management, LLC ("Morningstar") "as an 'Investment Manager' as defined in ERISA." (*Id.* at 12 § 1.4). *See* 29 U.S.C. § 1002(38) (defining "investment manager" as a "fiduciary" with "the power to manage, acquire, or dispose of any asset of a plan"). Virtua's *only*

role with respect to the LifeSpan Models was to "instruct [Lincoln Retirement] to pay Morningstar . . . whereby [Lincoln Retirement] serves only as paying agent in the administration of any payment to Morningstar." (Virtua Defs.' Ex. 15, ECF No. 47-1 at 12–13 § 1.4–1.5). Plaintiffs do not allege any facts to support a finding that the Virtua Defendants had discretionary control over the LifeSpan Models such that they were fiduciaries responsible for its performance. *See* 29 U.S.C. § 1002(21)(A) (stating that a person is a fiduciary only "to the extent" they "exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets"); *Santomenno*, 768 F.3d at 296–97 ("[I]t is clear that a complaint alleging breach of ERISA fiduciary duty must plead that the defendant was acting as a fiduciary 'when taking the action subject to complaint.'" (emphasis omitted) (quoting *Pegram*, 530 U.S. at 226)). Thus, neither Virtua, nor any of the other Virtua Defendants are fiduciaries with respect to the LifeSpan Models and related underperformance allegations.[12]

Plaintiffs' allegations as to the LifeSpan Models are therefore insufficient to support a claim for breach of the duty of prudence against the Virtua Defendants.

### iv.    Actively Managed Funds

The Amended Complaint also alleges that several actively managed funds selected and retained by the Plans were imprudent due to persistent underperformance. Specifically, Plaintiffs claim that four funds—Oakmark, Goldman SCV, MetWest, and Europacific Growth—were more

---

[12] While Plaintiffs' argue otherwise, (ECF No. 56 at 18), those allegations appear nowhere in the Amended Complaint and "the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 513 (D.N.J. 2021), nor can it overcome the documents which irrefutably establish otherwise. *Vorchheimer*, 903 F.3d at 112 (holding that when the documents relied upon "contradict [the] allegations in the complaint," the documents "control").

costly than peers, causing them to underperform benchmark indices. (Am. Compl., ECF No. 39 at ¶¶ 141–152 (Europacific Growth), 153–195 (Oakmark, Goldman SCV, and MetWest)).

The Court finds that only the Oakmark and Goldman SCV allegations raise a sufficient inference of imprudence to state a claim. For both funds, Plaintiffs argue that excessive fees alone are sufficient to state a claim. (*Id.* at ¶¶ 158, 175). The Court is not willing to go so far. *See Goldenberg*, 741 F. Supp. 2d at 631 ("A bare comparison of fees between different kinds of service providers is an insufficient factual basis for a claim of breach of fiduciary duty."). But the other underperformance allegations as to Oakmark and Goldman SCV sufficiently state a claim.

For Oakmark, Plaintiffs allege it failed to meet its benchmark category—Morningstar Gbl xUS Val TME NR USD—across a ten-year period and failed to match up to better-performing alternatives from Vanguard, American Beacon, DFA, and JPMorgan. (*Id.* at ¶¶ 158–160). The four specific comparator funds are alleged to be in the same size and fee category and also rely on Morningstar Gbl as their benchmark index. (*Id.* at ¶ 160). There are similar allegations with respect to the Goldman SCV fund. (*See id.* at ¶¶ 161–78). Plaintiffs provide comparison of this fund to its benchmark—Morningstar US Small Value Extended TR USD—and four "small blend" comparators that also carried the same benchmark metric. (*See id.* at ¶¶ 164, 177). While portions of the Oakmark and Goldman SCV allegations may be outside of the Class Period, (*see id.* at ¶¶ 162–66, 178), the alleged sustained level of underperformance as compared to designated benchmarks and close industry comparators leads the Court to find, at this procedural stage, that the allegations raise a sufficient inference of imprudence. *See Nicolas v. Trs. of Princeton Univ.*, No. 17-3695, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017) (finding adequately alleged underperformance allegations where the plaintiff identified benchmark indices and alternative funds). The Virtua Defendants' arguments to the contrary "raise[] factual questions about whether

the alternative funds Plaintiff[s] suggest" are sufficient to prove the merits of their imprudence claims, and thus do not warrant dismissal. *Id.*; *see also Pinnell v. Teva Pharm. USA, Inc.*, No. 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020) (noting that "factual disagreement[s]" about comparators "points to the need for discovery").

However, the adequacies of the Oakmark and Goldman SCV allegations highlight the inadequacies with those related to the MetWest and Europacific Growth funds. Plaintiffs allege that MetWest, a component investment of the LifeSpan Models, "lagged behind peers," by identifying the "Corporate Bond Cat. Avg." and citing advanced metrics such as "[g]eometric mean returns" to show underperformance. (*Id.* at ¶¶ 184–85, 188). The Europacific Growth fund—also a component of the LifeSpan Models—is similarly compared to the "Foreign Large Growth Average" and advanced metrics. (*Id.* at ¶¶ 145–52). But unlike the allegations as to the Oakmark and Goldman SCV funds, the Amended Complaint fails to set forth any factual allegations to identify *any* mode for relevant comparison to be drawn, *i.e.*, as to peers, years, or fee categories. *See Cho*, 2021 WL 4438186, at *8 (noting concern that "ERISA plaintiffs could challenge any fund so long as they could identify" a single fund "sharing some alleged similarities"). Moreover, the Europacific Growth allegations in particular do not suggest imprudence where Plaintiffs' own allegations seem to suggest it performed *better* than its purported comparator on average. (*See* Am. Compl., ECF No. 39 at ¶ 146).

Absent sufficient facts to permit a reasonable method of comparison, the Court cannot find an inference of imprudence based on the MetWest and Europacific Growth funds. The Oakmark and Goldman SCV funds, however, do raise such inference and based thereon thus adequately plead a claim.

v.    **Share Class Claims**

Finally, Plaintiffs allege that the Virtua Defendants acted imprudently by selecting and retaining higher-cost shares of Plan investment options when identical, lower-cost options were available.[13] (*See id.* at ¶ 243). Plaintiffs specifically point to six examples of investments for which the Plan could have selected share classes with lower expense ratios. (*Id.* at ¶¶ 90–97). These allegations adequately state a claim for breach of the duty of prudence.

Fiduciaries must "consider a plan's 'power . . . to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.'" *Sweda*, 923 F.3d at 328–29 (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc)).

The Virtua Defendants argue that the Share Class Claims fail because "merely alleging that a plan offered high-cost share classes for some period of time is insufficient to support a claim of fiduciary imprudence." (Virtua Defs.' Br., ECF No. 47 at 24). They also argue that the six mutual funds were, at various intervals, promptly replaced or removed. (*Id.* at 23–24). Pointing to *Mator*, the Virtua Defendants characterize Plaintiffs' allegations as essentially asking the Court to do what *Mator* explicitly rejected: "articulate a bright-line rule that a plan administrator breaches its fiduciary duty merely by offering retail-class [*i.e.*, higher cost] investment shares." (*Id.* at 24 (citing *Mator*, 102 F.4th at 182, 191)). These arguments are unavailing. While abstaining from creating a "bright-line rule," the *Mator* court nevertheless found that the plaintiffs "ha[d] alleged a fiduciary

---

[13]  The Virtua Defendants emphasize that this claim is plead in the Amended Complaint only as a failure to "investigate" claim, and that such characterization is belied by the Amended Complaint's own allegations that an investigation did in fact occur. (Virtua Defs.' Br., ECF No. 47 at 23–24). That view is too narrow, particularly in light of allegations elsewhere in the Amended Complaint that the violation is premised upon a failure "to monitor[] and take[] advantage of volume discounts in purchasing mutual fund shares," (ECF No. 39 at ¶ 89), and the holistic approach the Court must take in evaluating ERISA claims at the pleading stage.

breach based on the [p]lan's offerings of retail-class mutual fund shares . . . ." *Mator*, 102 F.4th at 190. Thus, *Mator*'s holding is merely a reflection of the Court's role in deciding a motion to dismiss—whether the allegations, accepted as true, plausibly create an inference of imprudence. Indeed, numerous courts have found allegations nearly identical to those alleged by Plaintiffs here to sufficiently state a claim. *See Humphries v. Mitsubishi Chem. Am., Inc.*, No. 23-06214, 2025 WL 2402281, at *10 (S.D.N.Y. Aug. 19, 2025); *Binder v. PPL Corp.*, No. 22-00133, 2024 WL 1096819, at *4 (E.D. Pa. Mar. 12, 2024); *Pinnell*, 2020 WL 1531870, at *5. Like *Mator*, these cases reflect the standard from which the Court must evaluate the Amended Complaint; "[w]hether [the Virtua] Defendants were actively monitoring the Plan's share-class offerings or playing catch-up cannot be resolved by the instant motion." *Humphries*, 2025 WL 2402281, at *10. "Neither the fact that a single mutual fund was moved from higher-cost to lower-cost shares, nor that the remaining funds were eventually removed from the Plan altogether, defeat Plaintiffs' well-pleaded allegations." *Id.* at *10. Although these questions may resurface in the context of a later summary judgment motion, the Amended Complaint's Share Class Claims sufficiently state a claim for breach of the duty of prudence to survive a motion to dismiss. The Virtua Defendants' Motion is therefore denied as to the Share Class Claim.

In sum, the Actively Managed Fund Claims and the Share Class Claims save Count I—the remainder of the allegations do not state a claim for breach of the duty of loyalty. The Virtua Defendants' Motion is therefore denied as to Count I.

### 3.  Prohibited Transactions (Counts III and V)

Like the claims against the Lincoln Defendants, Counts III and V allege prohibited transactions against Virtua, the Committee, and Sub-Committee. Despite initially moving to dismiss Count III, the Virtua Defendants in their Reply Brief concede that Count III plausibly states

a claim. (ECF No. 59 at 17). The Court will, however, grant the Virtua Defendants' Motion as to Count V.

Plaintiffs allege, *inter alia*, that Virtua, the Committee, and the Sub-Committee "caused the Plans to engage in the annuity transactions[14] with knowledge that the transactions constituted a direct or indirect exchange of property between the Plans and UBS/Morgan Stanley." (Am. Compl., ECF No. 39 at ¶ 267). But the Amended Complaint and Plaintiffs' brief confuse the statutory provisions under which Count V arises. The title heading for Count V in the Amended Complaint states that it is brought pursuant to 29 U.S.C. § 1106(b) (prohibiting transactions between the plan and a *fiduciary*), but the substantive allegations therein discuss the elements of a claim under 29 U.S.C. § 1106(a) (prohibiting transactions between the plan and a *party in interest*). Plaintiffs' brief only adds to the confusion. (*See* ECF No. 55 at 38–40 (arguing that "[s]elf-dealing is not a required element for a prohibited transaction claim under [29 U.S.C. § 1106(a)(1)(C)]" and discussing this provision, but also discussing the pleading requirements of Section 1106(b)). This matters because Sections "1106(a) and (b) have distinct purposes: '[s]ubsection (a) erects a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan,' and '[s]ubsection (b) prohibits plan fiduciaries from entering into transactions with the plan tainted by conflict-of-interest and self-dealing concerns.'" *Sweda*, 923 F.3d at 336 (alterations in original) (quoting *Iola*, 700 F.3d at 93).

---

[14]  As noted previously, if the "annuity transactions" referenced in Counts III, IV, and V are understood to refer to the initial establishment of the SVA through the Group Annuity Contract executed on July 6, 2015, (*see* Virtua Defs.' Ex. 16, ECF No. 47-1 at 43), any prohibited-transaction claim predicated on that transaction would appear to fall outside ERISA's six-year limitations period. *See* 29 U.S.C. § 1113(1)(A). Because the Virtua Defendants concede Count III states a claim and neither side has addressed the timeliness issue, the Court proceeds to consider the merits.

Construing Count V as a Section 1106(b) claim as titled, Plaintiffs' allegations fail to state a claim because the Amended Complaint does not allege any self-dealing or conflict-of-interest existed, nor that UBS/Morgan Stanley was a fiduciary to the "annuity transactions" complained of. *See Cain v. Siemens Corp.*, No. 24-8730, 2025 WL 2172684, at *5 (D.N.J. July 31, 2025) (dismissing a Section 1106(b) claim where the complaint failed to allege self-dealing or a conflict); *Danza*, 533 F. App'x at 126 ("Section 406(b)'s purpose is to prohibit transactions that might involve self-dealing by a fiduciary, not to prevent fiduciaries from being paid for their work."). (*See also* Am. Compl., ECF No. 39 at ¶¶ 228, 231, 267–69 (entirety of the allegations related to UBS/Morgan Stanley)).

Even construing Count V as asserting a Section 1106(a) claim, it fares no better. The Amended Complaint is devoid of non-conclusory allegations as to the role UBS/Morgan Stanley played with respect to the Plans, let alone any role it might have had in the allegedly prohibited "annuity transactions." The sum of the allegations concerning UBS/Morgan Stanley reveal only that UBS was hired in 2010 and that UBS/Morgan Stanley provided nondescript services to the Plans. (Am. Compl., ECF No. 39 at ¶¶ 228, 268). That is not enough to plead a Section 1106(a) claim, particularly where the Amended Complaint fails to identify the specific transaction with UBS/Morgan Stanley that allegedly violated ERISA. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993) (noting that Section 1106 prohibits only "certain kinds of business deals" that are "likely to injure the pension plan.")). Thus, Count V so construed nevertheless fails to state a claim.

Therefore, the Virtua Defendants' Motion will be granted as to Count V of the Amended Complaint, without prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Virtua Defendants' Motion to Dismiss, (ECF No. 45), is **GRANTED** without prejudice as to Counts II and V, and **DENIED** as to Count I and III; the Lincoln Defendants' Motion to Dismiss, (ECF No. 48), is **GRANTED** without prejudice as to Counts III and IV. An appropriate Order accompanies this Opinion and was entered on November 30, 2025. (ECF No. 73).

**CHRISTINE P. O'HEARN**
**United States District Judge**

Dated: December 3, 2025